**Ray AGOSTINO, individually and on behalf of all others similarly situated, Plaintiff,**

v.

**Thomas O. HICKS, Jack D. Furst, James N. Mill, Timothy L. Conlon, Richard W. Vieser, Kenneth F. Yontz, Thomas H. O'Brien, Brian Mulroney, David M. Sindelar, Hicks, Muse, Tate & Furst Incorporated, HMTF/Viasystems Partners, L.P., Hicks, Muse, Tate & Furst Equity Fund III, L.P., HM3 Coinve-**

---

stors, L.P., HMTF Equity Fund IV (1999), L.P., HMTF Private Equity Fund IV (1999), L.P., Hicks, Muse PG–IV (1999) C.V., HM4–SBS (1999) Coinvestors, L.P. and HM4–EQ (1999) Coinvestors, L.P., Defendants.

C.A. No. 20020–NC.

Court of Chancery of Delaware.
New Castle County.

Submitted: Nov. 10, 2003.
Decided: March 11, 2004.
Revised: March 22, 2004.

Pamela S. Tikellis and Robert J. Kriner, Jr., of Chimicles & Tikellis, LLP, Wilmington, Delaware, Robert S. Green and Robert A. Jigarjian, of Green & Jigarjian LLP, San Francisco, California, for Plaintiff, of counsel.

James L. Holzman and Paul A. Fioravanti, Jr., of Prickett, Jones & Elliott, P.A., Wilmington, Delaware, Robert C. Walters and William L. Wallander, of Vinson & Elkins L.L.P., Dallas, Texas, for Defendants, of counsel.

### *MEMORANDUM OPINION*

CHANDLER, Chancellor.

Pending before the Court is defendants' motion to dismiss plaintiff's amended complaint on the ground that it states derivative, as opposed to individual or direct, claims. Plaintiff was a shareholder of Viasystems Group, Inc. ("Viasystems" or the "Company") until his shares were eliminated without consideration after the Company filed for bankruptcy. For the reasons detailed below, I hold that the complaint states only derivative claims, which were extinguished in bankruptcy.

## I. FACTUAL ALLEGATIONS

Viasystems was founded in 1996 by Hicks, Muse, Tate and Furst Incorporated ("HMTF") and Mills & Partners, Inc. as a supplier of circuitry components to manufacturers of telecommunications equipment.[1] Viasystems raised roughly $890 million in an initial public offering in March 2000. Viasystems' financial performance improved after the IPO, but made a turn for the worse after Viasystems' Board of Directors approved a financing deal involving HMTF on July 19, 2001. This transaction forms the heart of the complaint.

The essence of the deal was an infusion of cash into Viasystems by HMTF in exchange for promissory notes and warrants to purchase Viasystems stock. Specifically, pursuant to a "Subscription Agreement" the Company received $100 million from HMTF.[2] In return, HMTF received $100 million in 14% promissory notes due

---

1. The facts referenced in the Opinion are drawn solely from the complaint.

2. Throughout this Opinion, I refer to HMTF to include several affiliated limited partnerships, including HMTF/Viasystems Partners,

in 2007 [3] and warrants to purchase 10,000,000 shares of Viasystems stock for a penny per share. The Subscription Agreement also obligated the Viasystems Board to put the warrant issuance to a shareholder vote in order to satisfy certain New York Stock Exchange regulations. With two directors abstaining, the Board approved the Subscription Agreement unanimously on July 19, 2001. Separately, but on the same day, two directors signed a voting agreement with HMTF pledging to vote their personal Viasystems shares in favor of the Agreement.

The Board of Viasystems at the time of the Subscription Agreement's approval included Thomas Hicks, Jack Furst, James Mills, Timothy Conlon, Richard Vieser, Kenneth Yontz, Thomas O'Brien, and Brian Mulroney.[4] A majority of the Board members were associated with HMTF apart from their role as directors of Viasystems: Hicks and Furst are HMTF partners; Mills manages HMTF affiliates; Vieser serves on the board of HMTF affiliates and is personally invested in HMTF; Yontz is personally invested in HMTF affiliates; and Mulroney is employed by HMTF. Although Hicks and Furst abstained from the July 19 vote, Mills, Vieser, Yontz, and Mulroney, all allegedly interested, voted for the transaction. Viasystems' Board on the date the Subscription Agreement was approved, as well as HMTF, are defendants in this action.[5] As will become important later, Viasystems in not a defendant.

HMTF, in addition to being a party to the Subscription Agreement, owned 49% of Viasystems common stock. When combined with defendants Mills and Conlon's shares (which was effectuated by the voting agreement executed on the same day as the Subscription Agreement), HMTF controlled over 50% of the voting shares. In other words, HMTF held sufficient voting power as of July 19 to approve the warrant issuance. On October 19, 2001, the Company held a special meeting to vote on the warrants and, unsurprisingly, shareholders approved the issuance of the warrants. But less than half of the shares not controlled by HMTF were voted in favor of the transaction.

From the time the Subscription Agreement was approved until the time that shareholders voted to approve the warrants, Viasystems' stock moved markedly downward. On July 19, the date of Board approval, the stock was valued at $3 per share. On October 5, the date of Viasystems' final proxy statement regarding the special meeting held for shareholders to vote on the warrant issuance, the stock was valued at $0.44. Viasystems' market capitalization had declined by over $300 million in that timeframe. By the fourth quarter of 2001, the Company's ability to

L.P., Hicks, Muse, Tate & Furst Equity Fund III, L.P., HM3 Coinvestors, L.P., HMTF Equity Fund IV (1999), L.P., HMTF Private Equity Fund IV (1999), L.P., Hicks, Muse PG–IV (1999), C.V., HM 4–SBS (1999) Coinvestors, L.P., and HM4–EQ (1999) Coinvestors, L.P. All of these limited partnerships owned Viasystems common stock and/or received warrants to purchase such shares pursuant to the Subscription Agreement. Furthermore, all are affiliated with the corporate entity Hicks, Muse, Tate and Furst Incorporated.

3. The notes contained a put feature that required the Company to repurchase the notes

at 101% of their accreted value upon a change of control of the Company.

4. Hicks and Furst, HMTF partners, were the two directors that abstained from the July 19 vote. Mills and Conlon signed the shareholders voting agreement.

5. Plaintiff also asserts claims against David Sindelar. Sindelar was at all times relevant an officer of Viasystems and was a director at the time that the transaction was presented to shareholders, but he was not a director when the Board voted to approve the transaction.

operate under the burden of its debt became increasingly difficult. In the first quarter of 2002, the Company retained an independent financial advisor to pursue debt-based restructuring. By April 2002, the New York Stock Exchange suspended trading of Viasystems' stock due to its low share price and total market capitalization.[6] During the Company's downward slide it was negotiating with its creditors to restructure and lessen its debt burden. On October 1, 2002, after negotiations with creditors ended, Viasystems filed a pre-packaged bankruptcy in the Bankruptcy Court for the Southern District of New York on October 1, 2002.

Approving the Company's restructuring plan, the Bankruptcy Court entered a Confirmation Order on January 14, 2003. The Confirmation Order eliminated the public stock of Viasystems for no consideration. Plaintiff's equity interest in the Company was eliminated, as was HMTF's and the other defendants. Similarly, HMTF's warrants were cancelled without consideration. The holders of Viasystems' notes (i.e., HMTF), however, received new stock in the Company in exchange for cancellation of those notes. Importantly for purposes of this Opinion, the Confirmation Order also provided that the claims alleged in the original complaint in this action, filed before the Company entered bankruptcy proceedings, were the property of Viasystems and were released.[7]

The Confirmation Order prompted the filing of the instant amended complaint–purporting to assert individual claims against the defendants. Plaintiff alleges that the Subscription Agreement, through the warrant issuance, transferred voting control of Viasystems to HMTF without compensation to shareholders, caused a "lock-up" of the Company, and precluded the pursuit of other value-maximizing transactions.[8] Plaintiff contends that the claims in the amended complaint can be asserted individually because the Confirmation Order released *Viasystems'* claims arising out of the financing transaction with HMTF. In other words, plaintiff argues that amended complaint states claims that belong to him independent of any claims the Company owned that were released by the Bankruptcy Court. Bearing this in mind, I turn to the task of ascertaining whether the claims are direct or derivative in nature.[9]

## II. LEGAL FRAMEWORK

### A. Historical Development of Derivative Litigation

 It is black-letter law that the board of directors of a Delaware corporation exercises all corporate powers and manages, or directs others in the management of, the business and affairs of the corporation.[10] One corporate power exercised by the board of directors is the con-

---

6. During this period HMTF increased its debt interest in Viasystems through open-market purchases. As a result of those purchases, HMTF owned a majority of the Company's unsecured debt.

7. Of potential benefit to Viasystems' insiders, the Confirmation Order provided that Viasystems would issue stock options to purchase up to 10% of the new stock in the Company and that 80% of those options would issue to its employees.

8. *See* Amended Complaint ("Am.Compl."), ¶ 69; Plaintiff's Answering Brief ("AB") at 16; Oral Argument Transcript ("Tr.") at 22–23.

9. Although, strictly speaking, the terms "direct" and "individual" may have different meanings in some contexts, I use the terms interchangeably to include all nonderivative claims.

10. 8 *Del. C.* § 141(a) ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors....").

duct of litigation that seeks to redress harm inflicted upon the corporation, including harm inflicted upon the corporation by its officers or directors from a breach of fiduciary duty owed to the corporation and its shareholders. Recognizing, however, that directors and officers of a corporation may not hold themselves accountable to the corporation for their own wrongdoing, courts of equity have created an ingenious device to police the activities of corporate fiduciaries: the shareholder's derivative suit.[11] Chancellor Wolcott described this device:

> Generally a cause of action belonging to a corporation can be asserted only by the corporation. However, whenever a corporation possesses a cause of action which it either refuses to assert or, by reason of circumstances, is unable to assert, equity will permit a stockholder to sue in his own name for the benefit of the corporation solely for the purpose of preventing injustice when it is apparent that the corporation's rights would not be protected otherwise.[12]

As the above description reveals, a derivative action may not be pursued if the corporation is willing and able to assert the suit on its own behalf, *i.e.*, the complaining shareholder must give the board of directors the opportunity to manage the litigation to its satisfaction or the board of directors must for some reason be incapable of pursuing the litigation.

The requirement that shareholders exhaust their remedies within the corporation before pursuing derivative litigation is found in Court of Chancery Rule 23.1. Rule 23.1 requires that the complaint in a derivative action "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Even if attempting to obtain the action that the plaintiff desires from the board of directors would be futile because a majority of the directors suffer some disabling interest, the board may appoint a special litigation committee of disinterested directors that may recommend dismissal of the derivative action after a reasonable investigation.[13] Rule 23.1 also requires, as does Section 327 of the Delaware General Corporation Law, that the complaint allege that "the plaintiff was a stockholder of the corporation at the time of the transaction."[14] Rule 23.1 further provides that a derivative action generally may not be dismissed or settled without approval of this Court and notice to other shareholders.[15] The requirements

---

**11.** The basic necessity for the creation of standing to assert claims derivatively is described well by a leading corporations text:
Litigation of any claim is costly and the results uncertain. As with other business decisions, corporate managers weigh the costs and benefits of enforcing claims via litigation, and generally choose to pursue only those actions that seem likely to produce a net benefit to the corporation. However, fiduciary litigation differs from ordinary claims in an obvious way—often the party sued will be one or more of the corporation's current directors. In calculating whether the corporation should sue, directors will be considering not only gains and losses to the corporation but also gains and losses to themselves. Thus, entrusting

all fiduciary litigation to directors' judgment would arguably result in less than optimal enforcement of fiduciary duty.
Charles R.T. O'Kelley, Jr. & Robert B. Thompson, CORPORATIONS AND OTHER BUSINESS ASSOCIATIONS: CASES AND MATERIALS 459 (2d ed.1996).

**12.** *Taormina v. Taormina Corp.*, 78 A.2d 473, 475 (Del.Ch.1951).

**13.** *Zapata Corp. v. Maldonado*, 430 A.2d 779, 785–89 (Del.1981).

**14.** 8 *Del. C.* § 327.

**15.** Although not specified by Rule 23.1, the corporation is an indispensable party to a

of Rule 23.1, while burdensome to the equitable device created by the courts to remedy harm inflicted upon a corporation, are necessary to prevent the potentially disruptive effects of derivative litigation on the ability of a board of directors to direct the business and affairs of a corporation.[16] The prerequisites to a derivative action, developed over time, have attempted to balance the Delaware prerogative that directors manage the affairs of a corporation with the realization that shareholder policing, via derivative actions, is a necessary check on the behavior of directors that serve in a fiduciary capacity to shareholders.[17]

The exacting procedural prerequisites to the prosecution of a derivative action create incentives for plaintiffs to characterize their claims as "direct" or "individual" in the sense that they seek recovery not for harm done to the corporation, but for harm done to them. A decision finding that a complaint alleges direct claims allows plaintiffs to bypass the ability of the corporation's board to decide, in the best interests of the corporation, how to proceed with the litigation. In clear-cut cases, where the corporation has not been harmed by the conduct at issue in the litigation but the plaintiff has suffered injury, bypassing the board's involvement in the litigation is of little concern. In fact, it seems wholly inappropriate to allow a board of directors to control litigation where the corporation's concerns are only tangential and the corporation would not share any eventual recovery.

In the instant case, the plaintiff attempts to characterize his claims as "direct" because he has no other alternative. The amended complaint makes no effort to comply with the pleading requirements of Rule 23.1 or 8 *Del. C.* § 327. The amended complaint does not even feign an attempt to plead demand futility. The corporation is not joined as a party. Moreover, as noted, the Company's claims, *i.e.*, those that could be asserted derivatively, were expressly released by the Bankruptcy Court *after* plaintiff's first complaint was filed here. All of these infirmities are sufficient, independently, for the Court to dismiss the complaint *if* it does not allege direct claims.

### B. Supreme Court Authority on the Derivative/Direct Distinction

Although there is only one issue to resolve, it is a difficult issue to resolve in many cases. The distinction between direct and derivative claims is frustratingly difficult to describe with precision. Reference to Supreme Court opinions, while cer-

---

derivative action. *Sternberg v. O'Neil,* 550 A.2d 1105, 1124 (Del.1988). In addition, as is relevant in the instant case, a derivative action becomes a part of the corporation's estate if it files for bankruptcy. *See, e.g., Garza v. TV Answer, Inc.,* 704 A.2d 844, 1997 WL 794504, at \*5 (Del.1997) (ORDER) (affirming dismissal of derivative action pursuant to settlement agreement approved by bankruptcy court).

16. As the venerable case of *Joy v. North,* 692 F.2d 880, 887 (2d Cir.1982), recognized over twenty years ago, "[d]erivative suits may be brought for their nuisance value, the threat of protracted discovery and litigation forcing settlement and payment of fees even where the underlying suit has modest merit. Such suits may be harmful to shareholders because the costs offset the recovery."

17. This balancing rationale extends to the bankruptcy concept, even though for a period of time the business and affairs of a Delaware corporation may be managed, for example, by a trustee pursuant to the bankruptcy code. As noted later in this Opinion, however, *see infra* note 86 and accompanying text, the balance may be tilted too far away from shareholders' ability to enforce fiduciary duties. It is quite possible that rigid application of federal bankruptcy law may interfere with the ability of Delaware corporate law to protect investors.

tainly instructive, does not conclusively resolve how this Court should draw the line between direct and derivative claims. The first Supreme Court case to address the direct/derivative distinction substantively was *Lipton v. News Int'l, Plc.*[18] In *Lipton,* the Supreme Court made specific reference to the concept of "special injury,"[19] a term coined by an earlier Court of Chancery opinion.[20] Specifically, the Court stated that "a plaintiff alleges a special injury and may maintain an individual action if he complains of an injury distinct from that suffered by other shareholders or a wrong involving one of his contractual rights as a shareholder."[21] Two years later, in *Kramer v. Western Pacific Industries, Inc.,*[22] the Supreme Court again addressed the direct/derivative distinction. In *Kramer,* the Court did not mention "special injury" when enunciating the standards it applied to the pertinent facts. Rather, the Court emphasized "[f]or a plaintiff to have standing to bring an individual action, he must be injured *directly* or *independently* of the corporation."[23] The standard used in *Kramer,* like the standard in *Lipton,* is also derived from an earlier Court of Chancery opinion.[24]

Several years later, in *In re Tri–Star Pictures, Inc. Litigation,*[25] the Supreme Court once again placed emphasis on the special injury concept, and failed to cite *Kramer* at all. In *Tri–Star,* the Supreme Court stated that it was *"well settled* that

the test used to distinguish between derivative and individual harm is whether the plaintiff suffered 'special injury' " and reiterated the test for special injury set forth in *Lipton.*[26] Despite the statement in *Tri–Star* that it was "well settled" that "special injury" is the relevant test to distinguish between direct and derivative claims, that terminology was again dropped in the Supreme Court's decision in *Grimes v. Donald.*[27] In *Grimes* the Supreme Court stated:

> Although the tests have been articulated many times, it is often difficult to distinguish between a derivative and an individual action. The distinction depends upon the nature of the wrong alleged and the relief, if any, which could result if plaintiff were to prevail. To pursue a direct action, the stockholder-plaintiff must allege more than an injury resulting from a wrong to the corporation. The plaintiff must state a claim for injury which is separate and distinct from that suffered by other shareholders or a wrong involving a contractual right of a shareholder which exists independently of any right of the corporation.[28]

The most recent Supreme Court opinion on this issue, *Parnes v. Bally Entertainment Corp.,*[29] like *Grimes,* did not mention "special injury" and stated "Stockholders may sue on their own behalf (and, in appropriate circumstances, as representatives of a class of stockholders) to seek

---

18. 514 A.2d 1075 (Del.1986).

19. *Id.* at 1078.

20. *Elster v. American Airlines, Inc.,* 100 A.2d 219 (Del.Ch.1953).

21. *Lipton,* 514 A.2d at 1078.

22. 546 A.2d 348 (Del.1988).

23. *Id.* at 351 (emphasis in original).

24. *Moran v. Household Int'l. Inc.,* 490 A.2d 1059 (Del.Ch.1985).

25. 634 A.2d 319 (Del.1993).

26. *Id.* at 330 (emphasis added).

27. 673 A.2d 1207 (Del.1996).

28. *Id.* at 1213 (citations and internal punctuation omitted).

29. *Parnes v. Bally Entm't Corp.,* 722 A.2d 1243 (Del.1999).

relief for direct injuries that are independent of any injury to the corporation." [30]

An analysis of *Parnes* and *Kramer* reveals precisely how difficult the task of distinguishing between direct and derivative claims has become. In *Kramer*, a former stockholder of Western Pacific Industries alleged that a series of wrongful transactions resulted in the diminution of the amount paid to shareholders after a merger with the Danaher Corporation. The *Kramer* decision found that such allegations only amount to "waste" and the plaintiff was not injured "independently." [31]

In *Parnes*, the complaint alleged that the Chairman and CEO of Bally wrongfully required that corporate assets be transferred to him in order to garner his consent in moving forward with a merger with Hilton Hotels Corporation. The *Parnes* decision found that such allegations "directly challenge[d] the Bally merger." [32] *Parnes* distinguished *Kramer* on the grounds that the complaint in *Kramer* only alleged that the wrongful conduct "reduced the amount paid to Western's stockholders" and "did not allege that the merger price was unfair." [33]

The rationale given by the Supreme Court in *Parnes* for distinguishing *Kramer* is somewhat indeterminate. Although the complaint in *Kramer* may not have alleged that the merger price was unfair, it did allege that shareholders received less of the merger proceeds because of a series of wrongful transactions leading up to the merger. It elevates form over substance to allow a complaint to go forward simply by adding a sentence to the complaint that alleges that the wrongful transactions at issue resulted in an unfair merger price. Such a standard would seemingly allow a plaintiff's designation to trump the body of the complaint. Additionally, if a merger price is fair, but shareholders are nonetheless harmed, that seems to be a case where the injury suffered is "independent" of the corporation's injury. Stated differently, if a corporation receives adequate consideration in a merger, but shareholders do not receive their fair share of that consideration, that would imply that only the shareholders, rather than the corporation itself, were harmed by the wrongful conduct. Conversely, a complaint that "directly challenges the fairness of the process and the price" [34] of a merger suggests, to my mind, that the corporation suffered harm in the form of inadequate consideration for the sale of itself as a going concern and that the harm suffered by shareholders is only a natural and foreseeable consequence of the harm to the corporation.[35]

---

**30.** *Id.* at 1245.

**31.** *Kramer* also stated in the same breath that the plaintiff was not injured "directly." Although there may be a limitation on the number of ways to describe a direct claim, it does not advance this Court's ability to distinguish between direct and derivative claims by describing a direct claim as one in which the plaintiff was injured directly. As one commentator has noted, perhaps the problem lies in the test itself:

> An injury to the shareholder is direct, and therefore individual, only if the shareholder has the right to sue for redress of the injury, and it is indirect only if he does not have that right. But that is the very issue one is

trying to resolve. The injury test, therefore, becomes tightly circular.

John W. Welch, *Shareholder Individual and Derivative Actions: Underlying Rationales and the Closely Held Corporation,* 9 J. CORP. L. 147, 155 (1984).

**32.** *Parnes,* 722 A.2d at 1246.

**33.** *Id.* at 1245.

**34.** *Id.*

**35.** It is unclear why a "direct" challenge to a merger price is *ipso facto* a "direct" claim. If a "direct" challenge to a transaction gives rise to a direct claim, I cannot ascertain in any principled manner why a "direct" attack

Another curious aspect of the *Parnes* decision is its citation to *Lewis v. Anderson.*[36] The Court, early in its discussion of whether the claim in *Parnes* was direct or derivative, states: "A stockholder who directly attacks the fairness or validity of a merger alleges an injury to the stockholders, not the corporation, and may pursue such a claim even after the merger at issue has been consummated."[37] The Court cites as authority for this proposition footnote 10 in *Lewis* which sets forth two exceptions to the rule that a derivative shareholder must satisfy the "continuous ownership" requirement: "(1) where the merger itself is the subject of a claim of fraud; and (2) where the merger is in reality a reorganization which does not affect plaintiff's ownership of the business enterprise."[38] *Lewis* describes these as exceptions to the "rule of standing as applied to mergers."[39] *Lewis* did not categorize these two exceptions as instances where a plaintiff has alleged "injury to the stockholders, not the corporation."[40] In-

deed, I am not sure why the Court would have done so because there is no continuous ownership requirement in a direct action that would be in need of an exception. But because of *Parnes'* reference to footnote 10 in *Lewis* it may now be the case that an exception to the standing requirement in a derivative action is, in fact, the same thing as a direct action. In my opinion, however, these are intellectually distinct inquiries.[41]

Our jurisprudence on this issue is also ambiguous regarding the relevance of the concept of "special injury" in the direct/derivative analysis. Although the "special injury" terminology has disappeared in recent opinions, the earlier opinions of *Lipton* and *Tri–Star* have not been explicitly disavowed. Equally ambiguous is whether the standard enunciated in *Grimes* and *Parnes,* that a shareholder must suffer an injury independent of an injury to the corporation, is a distinct inquiry or whether it is grafted onto the special injury test.[42] What *is* clear is that *Lipton* and

on a non-merger transaction would not also state a "direct" claim obviating a plaintiff's need to adhere to the procedural prerequisites of bringing a derivative claim. It is also interesting to note that the Third Circuit Court of Appeals characterized the interaction of *Parnes* and *Kramer* as "the exception to *Kramer* set forth in *Parnes." Furst v. Feinberg,* 54 Fed.Appx. 94, 99 (3d Cir.2002).

**36.** 477 A.2d 1040 (Del.1984).

**37.** *Parnes,* 722 A.2d at 1245.

**38.** *Lewis,* 477 A.2d at 1040 n. 10.

**39.** *Id.* at 1040.

**40.** *Parnes,* 722 A.2d at 1245.

**41.** Other members of this Court have raised questions regarding the application of *Parnes. See Golaine v. Edwards,* 1999 WL 1271882 (Del.Ch. Dec.21, 1999) (Strine, V.C.). Vice Chancellor Strine noted that, in his view, *"Parnes* deepens the merit-based nature of the derivative-individual distinction." *Id.* at *7.

In the Vice Chancellor's view, whether a plaintiff has stated an individual claim is merging with whether a claim is stated under Rule 12(b)(6) (at least in the merger context). *Id.* It may be the case that Delaware law is moving incrementally towards a "merits-based" exception to the test for derivative litigation, an exception that would allow plaintiffs to proceed with derivative litigation when a meritorious claim of fiduciary breach by directors causing injury to the corporation (at least in the merger context) has been stated.

**42.** Yet another ambiguity is the extent to which the adoption of what one commentator has referred to as the "categorical approach" interacts with the "special injury" test. *See* Welch, *supra* note 31, at 157. In other words, when the Court makes no mention of "injury," but nonetheless recognizes that one set of actions give rise to individual suits and another set give rise to derivative suits, to what extent does such a recognition inform the application of the "special injury" test to undefined categories of actions?

*Tri–Star* cannot be interpreted literally. A claim alleging disclosure violations, for example, does not state injury distinct from injury suffered by other shareholders, nor does it involve a contractual right of shareholders, but *Tri–Star* stated that alleged disclosure violations are direct in nature.[43] Perhaps the only standard worth noting is that each case turns on its own facts and that *Lipton, Kramer*, and their progeny merely serve as rough guideposts for this Court's analysis. Although such a state of affairs is conducive to expensive litigation, it falls woefully short of providing coherent guidance to this Court's constituents.[44]

## C. Moving Forward

Notwithstanding these ambiguities, the initial step of ascertaining whether a complaint alleges direct or derivative claims is uncontroverted and quite practical. This Court should look to the "na-ture of the wrong alleged"[45] and "the relief, if any, which could result if [the] plaintiff were to prevail."[46] Moreover, this Court should conduct such an inquiry by looking to "the body of the complaint, not the plaintiff's designation or stated intention."[47] Given the discussion above, however, the question is where to go from there. In my opinion, what must be discarded is the notion of using special injury, *i.e.*, "injury which is separate and distinct from that suffered by other shareholders"[48] as a talismanic entreaty to the assertion of an individual claim.[49] Although I have questions about how I should apply *Parnes*, it does move to, in my opinion, the more grounded approach of asking whether the plaintiff has suffered injury "independent of any injury to the corporation."[50] As noted by the Supreme Court in *Grimes*, "[t]o pursue a direct action, the stockholder-plaintiff must allege more than an injury resulting from a wrong to the corporation."[51] This

---

**43.** 634 A.2d at 330 n. 12.

**44.** "The corporate planner must understand the 'comparative costs of planning, adapting, and monitoring task completion under alternative governance structures.' This requires sophisticated understanding not only of substantive business association law, but also the fundamental tensions present in any business organization and the characteristics and needs of the particular client." Charles R.T. O'Kelley, *Preparing the Corporate Lawyer: Delaware Corporation Law and Transaction Cost Engineering*, 34 GA. L.REV. 929, 938 (2000) (quoting OLIVER E. WILLIAMSON, THE ECONOMIC INSTITUTIONS OF CAPITALISM: FIRMS, MARKETS, RELATIONAL CONTRACTING 2 (1985)).

**45.** *Elster*, 100 A.2d at 223 (quoting *Selman v. Allen*, 121 N.Y.S.2d 142, 146 (N.Y.Sup.1953)).

**46.** *Kramer*, 546 A.2d at 352 (citing *Elster*, 100 A.2d at 221–23).

**47.** *Lipton*, 514 A.2d at 1078.

**48.** *Grimes* at 1213 (citations and internal punctuation omitted).

**49.** This notion may have already gathered favor in the Supreme Court by the fact that

"special injury" is not mentioned in *Grimes* and *Parnes*.

**50.** 722 A.2d at 1245.

**51.** *Grimes*, 673 A.2d at 1213 (citations and internal punctuation omitted). While this statement made in *Grimes* is instructive, it goes on to state: "The plaintiff must state a claim for injury which is separate and distinct from that suffered by other shareholders or a wrong involving a contractual right of a shareholder which exists independently of any right of the corporation." *Id.* In my opinion the first part of that sentence, which is often referred to as "special injury," should not be viewed as essential to the assertion of a direct claim (even if the complaint does not involve a "contractual right"). It is an indicator that is helpful in analyzing whether a claim is direct or individual. The second part of that sentence also should not be read exclusively. Although a contractual right of a shareholder that exists independently of any right of the corporation may very well state a direct claim, I think that the focus is more productively aimed primarily at whether the wrong alleged resulted in harm to the shareholder, and not the corporation.

test is given more body by the American Law Institute:

> A direct action may be brought in the name and right of a holder to redress an injury sustained by, or enforce a duty owed to, the holder. An action in which the holder can prevail without showing an injury or breach of duty to the corporation should be treated as a direct action that may be maintained by the holder in an individual capacity.[52]

In other words, the inquiry should focus on whether an injury is suffered by the shareholder that is not dependent on a prior injury to the corporation. In the context of a complaint asserting breaches of fiduciary duty—duty that under Delaware law runs to the corporation *and* the shareholder[53]—the test may be stated as follows: Looking at the body of the complaint and considering the nature of the wrong alleged and the relief requested, has the plaintiff demonstrated that he or she can prevail without showing an injury to the corporation?[54]

## III. ANALYSIS

### A. *Plaintiff's Claims are Derivative*

The plaintiff alleges that the Subscription Agreement resulted in "a transfer of absolute voting control to the Hicks Muse Entities" and "included a draconian irrevocable lock up of the Company which precluded the pursuit of value maximizing transactions and the payment of a control premium to the stockholders without approval of the Hicks Muse Entities."[55] In his brief in opposition to the defendants' motion to dismiss, the plaintiff states that the Subscription Agreement allowed HMTF to take "majority voting control from minority stockholders without paying a control premium."[56] These alleged wrongs all flow from one aspect of the Subscription Agreement: the warrants.[57] The key feature of the warrants for purposes of this Opinion is that if they had ever been exercised, HMTF would have owned a majority of the outstanding shares of the Company.

**52.** 2 American Law Institute, PRINCIPLES OF CORPORATE GOVERNANCE: ANALYSIS AND RECOMMENDATIONS § 7.01(b) at 17. The American Law Institute test was cited with approval in *Grimes*, 673 A.2d at 1213.

**53.** "The directors and officers of a corporation independently owe fiduciary duties directly to the stockholders." *Arnold v. Soc. for Savs. Bancorp*, 1995 WL 376919, at *8, 1995 Del.Ch. LEXIS 86, at *24 (Del.Ch. June 15, 1995) (citing *Smith v. Van Gorkom*, 488 A.2d 858, 890 (Del.1985)).

**54.** Since the fiduciary duty of officers and directors runs to the corporation and the shareholder, *see id.*, the shareholder will always be able to assert a breach of duty owed to it, but plainly not all fiduciary duty claims are individual claims. As such, in the context of fiduciary duty claims, the focus should be on the nature of the injury. In other contexts, the focus upon to whom the relevant duty is owed will allow the segregation of derivative claims. For example, if the owner of stock in a corporation is entitled to vote his shares (either by default rule of 8 *Del. C.* § 212(a) or

otherwise), the stockholder is the holder of the right to vote (the corporation owing the duty to allow the stockholder to vote). If a corporation wrongfully prevents a stockholder from exercising his or her right to vote, the stockholder may assert individual ownership over the claim.

**55.** Am. Compl. ¶ 69.

**56.** AB at 16. This statement is quite dubious, as it purports that HMTF took majority control from a minority of shareholders. *See infra* notes 67–68 and accompanying text.

**57.** Plaintiff also stated at oral argument that the alleged "direct" injury was suffered as of July 19, 2001–the date the Board approved the Subscription Agreement. *See* Tr. at 22–23. In other words, plaintiff does not argue that HMTF's actions after July 19, or the subsequent bankruptcy proceedings, are determinative of whether the complaint alleges individual claims.

The first discernible injury allegedly suffered by plaintiff is that the Subscription Agreement precluded the pursuit of other "value maximizing transactions."[58] The rationale given in the complaint for this effect of the Subscription Agreement is that HMTF would exercise the warrants (allowing it to obtain voting control) and subsequently vote against any transaction that did not align with HMTF's purported predisposition towards a debt-based reorganization strategy.[59] The first problem with this purported injury is that there is no allegation that a value-maximizing transaction was on the horizon. A second, larger problem is that the warrants were never exercised, and were subsequently cancelled by the Confirmation Order. Consequently, HMTF did nothing to actually impede the pursuit of a value-maximizing transaction (even if that transaction actually existed). In sum, the alleged injury is rank speculation.

■■■ Even if I were to assume for the sake of argument that an alternative, value-maximizing transaction was a reality, that the warrants were exercised, and HMTF used its majority control to block the transaction, the plaintiff has not demonstrated that he can prevail on this issue without showing an injury to Viasystems. These series of events as described would have harmed the Company because the Company would have been precluded from entering into a transaction that would have maximized the return on its assets. The plaintiff has advanced no argument as to why all shareholders would not be affected equally by such an occurrence.[60] Nor is there any claim that the preclusion of alternative, value-maximizing transactions implicates a contractual right of plaintiff. In my opinion, the nature of this claim is nothing more than a claim of mismanagement that, "if proven, represents a direct wrong to the corporation that is indirectly experienced by all shareholders."[61] As such, "the wrong alleged is entirely derivative in nature."[62]

■■■ The second type of injury discernible from the complaint, the transfer of voting control without the payment of a control premium, also does not state a cognizable direct claim. Plaintiff, in order to state an individual claim, relies on *Paramount Communications, Inc. v. QVC Network, Inc.*,[63] where the Supreme Court stated:

> The acquisition of majority status and the consequent privilege of exerting powers of majority ownership come at a price. That price is usually a control premium which recognizes not only the value of a control block of shares, but also compensates the minority stockholders for their resulting loss of voting power.[64]

---

58. I say discernible, because while the complaint is not "a pastiche of prolix invective," *Brehm v. Eisner*, 746 A.2d 244, 249 (Del. 2000), it is poorly drafted and rife with conclusory allegations that serve to complicate the work of this Court.

59. *See* Am. Compl. ¶ 43. I assume that the warrants could also simply have deterred another entity from exploring a transaction with Viasystems.

60. "[W]here a plaintiff shareholder claims that the value of his stock will deteriorate and that the value of his proportionate share of the stock will be decreased as a result of alleged director mismanagement, his cause of action is derivative in nature." *Kramer*, 546 A.2d at 353 (citing *Elster*, 100 A.2d at 222).

61. *Id.*

62. *Id. See also Thorpe v. CERBCO, Inc.*, 611 A.2d 5, 9 (Del.Ch.1991) ("[T]he diversion of the opportunity to sell ... on advantageous terms–is a corporate, not a shareholder claim.").

63. 637 A.2d 34 (Del.1994).

64. *Id.* at 43.

The Supreme Court's decision is of no assistance to the plaintiff, however, for four reasons. First, the Court in *Paramount* made no attempt to delineate whether the failure to pay a control premium states an individual or derivative claim. Second, since the warrants were never exercised, HMTF did not actually obtain majority status at the expense of the minority.[65] Third, HMTF paid a price for the warrants. The warrants were issued as partial consideration for providing $100 million to Viasystems (the benefits of which were indirectly shared by plaintiff). Plaintiff's claim seems merely to question the adequacy of the consideration the Company received for the warrants—undoubtedly a derivative claim.[66]

The last and most important reason the plaintiff was not entitled to a control premium is because he did not have majority status. HMTF held 49% of the Company's shares before the transaction. The other named defendants' holdings, when combined with HMTF's holdings, exceeded 50%. The class, as plaintiff has voluntarily chosen to define it, includes only a minority of Viasystems' outstanding shares as of the date of the Subscription Agreement– the date that plaintiff alleges the direct injury occurred.[67] Hence, under *Paramount*, there was no loss of voting power

requiring compensation.[68] After recognizing the absence of any entitlement to a control premium, it becomes clear to this Court that the true nature of the alleged wrong is that the Company received inadequate consideration for the warrants. Plaintiff cannot prevail on his claim without showing that Viasystems was injured directly. The injury suffered by plaintiff, a devaluation of his stock, was a natural and expected consequence of the injury initially borne by the Company; the injury thus is not individual in nature.

### B. An Exception?

■ Apart from the wrong alleged, plaintiff also argues that the limited group of stockholders seeking relief justifies labeling their claims as direct. Plaintiff's brief states:

> [T]he Amended Complaint seeks a recovery for investors injured by Defendants' conduct—namely, Plaintiff and the Class. The Amended Complaint specifically excludes from the Class definition the Defendants and their affiliates. Plaintiff's claims are, therefore, direct in nature.[69]

This statement is profoundly unenlightening, but in support of it plaintiff cites to *In re Cencom Cable Income Partners, L.P.*

---

**65.** *See In re Berkshire Realty Co., Inc. S'holder Litig.*, 2002 WL 31888345, at \*4, 2002 Del.Ch. LEXIS 146, at \*15–16 (Del.Ch. Dec. 18, 2002) (categorizing claims as derivative because unexercised warrants "could not have been at the 'sole expense' of the minority shareholders"). For the same reason, the plaintiff cannot make out a claim under *Tri-Star*, 634 A.2d 319, because there is no allegation of actual vote dilution and, under the reasoning of *Berkshire*, contingent vote dilution does not form the basis of a direct claim.

**66.** *See Kramer*, 546 A.2d at 353 ("[M]ismanagement resulting in corporate waste, if proven, represents a direct wrong to the corporation that is indirectly experienced by all shareholders.").

**67.** Tr. at 22–23.

**68.** In addition, plaintiff cannot contend that the transaction resulted in a shift of voting control from a "fluid aggregation of unaffiliated stockholders," *Paramount*, 637 A.2d at 43, to HMTF. Defendants Conlon and Mills aggregated their shares with HMTF in order to approve the warrants—an act that, as shareholders, they were entitled to undertake. *See Bershad v. Curtiss–Wright Corp.*, 535 A.2d 840, 845 (Del.1987) ("Stockholders in Delaware corporations have a right to control and vote their shares in their own interest.").

**69.** AB at 17.

*Litigation* [70] and *In re Gaylord Container Corp. Shareholders Litigation.* [71] These cases, along with *Fischer v. Fischer,* [72] create what commentators have described as an "unjust enrichment exception" to the classification of derivative claims. [73] Vice Chancellor, now Justice, Steele, explained the type of rationale that leads to the creation of such an exception:

> An eventual victory for plaintiff, would achieve little since the individual defendants own an overwhelming interest in [the nominal defendant corporation]. The pleaded fundamental wrong alleged underlies both the asserted individual and derivative claims. Equity's appropriate focus should be the alleged wrong, not the nature of the claim which is no more than a vehicle for reaching the remedy for the wrong. As equity will not suffer a wrong without a remedy, I must permit plaintiff's individual claims to proceed. [74]

Similar language, in a slightly different context, is found in *Gaylord,* [75] where Vice Chancellor Strine stated:

> [S]hould the directors be entitled to recover damages for the economic injury they inflicted on themselves as stockholders? If the answer is no because of the fact that they created the harm, this factor would support awarding relief to the class of innocent stockholders, not the corporation. [76]

In *Cencom,* then-Vice Chancellor Steele commented on *Gaylord* by noting that "the potential inclusion of culpable parties in class due relief may affect the distinction between derivative and direct claims" [77] and that Vice Chancellor Strine's comments in *Gaylord* supported his finding "that the limited scope of the group of claimants seeking relief justifies labeling these claims as direct." [78]

I am unable to squeeze the plaintiff's derivative claim into the limited exception created by these authorities. *Cencom,* which involved a dissolving partnership, is limited to its own unique set of facts. In that case the Court found that "[w]ith the partnership in dissolution the 'partnership' entity is simply an artifice representing the relationship between two legally juxtaposed parties and is no longer relevant as a distinct legal creature for the purpose of resolving the final claims between these parties." [79] Here, Viasystems is still relevant as a distinct legal creature for the purposes of this litigation. Moreover, in *Akins v. Cobb,* [80] Vice Chancellor Strine "decline[d] the plaintiffs' invitation to read the fact-intensive [Cencom] decision ... broadly and to extend that broad reading into the corporate context." [81] I similarly decline to expand *Cencom* into the corporate context because once such a step is made, any attempt by later courts to limit the "unjust enrichment exception" would only add to the confusing ambiguities surrounding the direct/derivative distinction.

70. 2000 WL 130629 (Jan. 27, 2000).

71. 747 A.2d 71, 81 (Del.Ch.1999).

72. 1999 WL 1032768, at *4 (Del.Ch. Nov.4, 1999).

73. Kurt M. Heyman & Patricia L. Enerio, *The disappearing Distinction Between Derivative and Direct Actions,* 4 Del. L. Rev. 155, 181 (2001).

74. *Fischer,* 1999 WL 1032768, at *4.

75. 747 A.2d 71.

76. *Id.* at 80.

77. 2000 WL 130629, at *5.

78. *Id.*

79. 2000 WL 130629, at *6.

80. 2001 WL 1360038 (Del.Ch. Nov.1, 2001).

81. *Id.* at *6 n. 18.

*Gaylord* is similarly inapplicable because of factual circumstances not present in this case. In *Gaylord*, plaintiffs asserted claims that related to the adoption of defensive measures.[82] As Vice Chancellor Strine noted, "the injury suffered results from the directors' action impeding the stockholders from divesting themselves of their personal property, not from actions of the directors directly impairing the value of the enterprise itself to the indirect detriment of all stockholders."[83] In other words, Vice Chancellor Strine found that the plaintiffs in that case could prove an injury to themselves without necessitating any proof that the corporation itself was injured. As noted above, the plaintiff in this case is unable to make such a showing.[84]

Even if I were inclined to expand and broaden the reach of these precedents, I am faced with a large obstacle: the Supremacy Clause.[85] In this case, unlike *Gaylord* and *Cencom*, federal law operated to extinguish plaintiff's claim entirely. Admittedly, the fact that the potential derivative claims were extinguished by the Bankruptcy Court is as compelling a reason as any for using this Court's equitable powers to allow the lawsuit to proceed. When a Delaware corporation files for bankruptcy, meritorious derivative claims often disappear—a phenomenon noted by one scholar:

[T]he filing of a bankruptcy petition spells doom for most derivative suits filed against the corporation's managers. Because of the frequent death of a derivative suit in the event a firm files for bankruptcy—a phenomenon I refer to as bankruptcy's 'black hole effect'—plaintiffs' attorneys are likely to discount the value of any given case, that is, diminish their initial investment to reflect the possibility of bankruptcy. Thus, bankruptcy exacerbates the incentives for plaintiffs' attorneys to underinvest in the individual lawsuits in their portfolio.[86]

The bankruptcy process may very well be altering the attempted balance under Delaware law between placing the responsibility for managing litigation with the directors of a corporation and the need for shareholder policing of directors' behavior. This may be a case where a meritorious derivative lawsuit is destroyed by the bankruptcy process, contrary to the effort of Delaware law to protect shareholders who have been wronged. The solution to this problem, however, more properly lies with the United States Congress, not this Court.

## IV. CONCLUSION

For all the reasons stated herein, I grant defendants' motion to dismiss. The

---

82. 747 A.2d at 72.

83. *Id.* at 80.

84. I disagree with the proposition implicit in plaintiff's papers that exclusion of culpable parties in the class due relief may affect the distinction between derivative and direct claims. The identity of the culpable parties does not speak to whether the conduct of those parties injured the corporation, rather than its shareholders. Additionally, to hold otherwise would elevate the plaintiff's designation and stated intention over the true nature of the claims—focusing excessively on who is requesting relief rather than what relief is requested.

85. U.S. CONST. ART. VI. Even if I was comfortable with using an equitable exception to circumvent federal law, I would still have some reservations invoking equitable principles to circumvent Delaware statutes and this Court's rules, *e.g.*, 8 *Del. C.* § 327 and Rule 23.1. It seems the province of the General Assembly and, perhaps, the Supreme Court, to make such a decision—not this Court.

86. David A. Skeel, Jr., *Rethinking the Line Between Corporate Law and Corporate Bankruptcy*, 72 Tex. L.Rev. 471, 500 (1994). Professor Skeel advocates "return[ing] control over corporate bankruptcy to the states." *Id.* at 553.

complaint states only derivative claims and must be dismissed for failure to join Viasystems as an indispensable party, failure of plaintiff to adhere to the continuous ownership requirement, and because these claims were dismissed by the United States' Bankruptcy Court's Confirmation Order.[87]

IT IS SO ORDERED.

87. Defendants raised other grounds upon which to dismiss the complaint, none of which I need reach.