IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BROOKFIELD ASSET MANAGEMENT, INC., ORION US HOLDINGS 1 L.P., BROOKFIELD BRP HOLDINGS (CANADA) INC., BRIAN LAWSON, HARRY GOLDGUT, RICHARD LEGAULT, SACHIN SHAH, and JOHN STINEBAUGH, | § § § § § § § § § § | |
| | § | No. 406, 2020 |
| Defendants-Below, Appellants/Cross-Appellees, | § § § § | |
| v. | § § § | Court Below: Court of Chancery of the State of Delaware |
| MARTIN ROSSON and CITY OF DEARBORN POLICE AND FIRE REVISED RETIREMENT SYSTEM (CHAPTER 23), | § § § § § § | C.A. No. 2019-0757 |
| Plaintiffs-Below, Appellees/Cross-Appellants. | § § § | |

Submitted:   June 30, 2021
Decided:     September 20, 2021

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc.*

Upon appeal from the Court of Chancery. **REVERSED**.

Kevin G. Abrams, Esquire, Eric A. Veres, Esquire, Stephen C. Childs, Esquire, Abrams & Bayliss LLP, Wilmington, Delaware. *Of Counsel*: John A. Neuwirth, Esquire (*argued*), Stefania D. Venezia, Esquire, Amanda K. Pooler, Esquire, Weil, Gotshal & Manges LLP, New York, New York *for Appellants/Cross-Appellees*.

Ned Weinberger, Esquire, Derrick Farrell, Esquire, Mark Richardson, Esquire, Labaton Sucharow LLP, Wilmington, Delaware; Peter B. Andrews, Esquire, Craig J. Springer, Esquire, David M. Sborz, Esquire, Andrews & Springer LLC, Wilmington, Delaware. *Of Counsel*: Steven J. Purcell, Esquire, Douglas E. Julie, Esquire (*argued*), Robert H. Lefkowitz, Esquire, Kaitlyn T. Devenyns, Esquire, Purcell Julie & Lefkowitz LLP, New York, New York; Jeremy S. Friedman, Esquire, David F.E. Tejtel, Esquire, Friedman Oster & Tejtel PLLC, Bedford Hills, NY *for Appellees/Cross-Appellants*.

**VALIHURA**, Justice:

This is an interlocutory appeal from an Opinion and Order of the Court of Chancery holding that Appellees/Cross-Appellants, former stockholders of TerraForm Power, Inc. ("TerraForm"), have direct standing to challenge TerraForm's 2018 private placement of common stock to Appellant/Cross-Appellees Brookfield Asset Management, Inc. and its affiliates, a controlling stockholder, for allegedly inadequate consideration. The trial court held that Plaintiffs did not state direct claims under *Tooley v. Donaldson, Lufkin & Jennette, Inc.*,[1] but did state direct claims predicated on a factual paradigm "strikingly similar" to that of *Gentile v. Rossette*,[2] and that *Gentile* was controlling here. Appellants contend that *Gentile* is inconsistent with *Tooley* and that this Court's decision in *Gentile* has created confusion in the law and therefore ought to be overruled.

Overruling a precedent of this Court should only occur after a full and fair presentation and searching inquiry has been made of the justifications for such judicial action. Having now engaged in such inquiry after a full and fair presentation of the issues by the parties, and for the reasons set forth herein, we now overrule *Gentile*. Accordingly, we **REVERSE** the judgment below, not because the Court of Chancery erred, but rather, because the Vice Chancellor correctly applied the law as it existed, recognizing that the claims were exclusively derivative under *Tooley*, and that he was bound by *Gentile*.

---

[1] 845 A.2d 1031 (Del. 2004).

[2] 906 A.2d 91 (Del. 2006).

## I. Relevant Facts and Procedural Background[3]

### A. The Parties

Nominal Defendant Below TerraForm Power, Inc. ("TerraForm" or the "Company") was, at the time of the proceedings below, a publicly traded Delaware corporation with its principal place of business in New York City. TerraForm acquired, owned, and operated solar and wind assets in North America and Western Europe.[4] The Company's common stock traded on the NASDAQ Stock Market under the ticker symbol "TERP."

Appellant Brookfield Asset Management, Inc. ("Brookfield") is a Canadian corporation headquartered in Toronto. Brookfield is an alternative asset manager that primarily conducts business through subsidiaries.[5] At the time the Complaint was filed, Brookfield and its affiliates beneficially owned 61.5 percent of TerraForm.

Appellant Orion US Holdings 1 L.P. ("Orion Holdings") is a Delaware limited partnership and an affiliate of Brookfield through which Brookfield has held beneficial voting and dispositive power over Brookfield's TerraForm shares.

---

[3] The facts, except as otherwise noted, are taken from the operative Verified Stockholder Derivative and Class Action Complaint, C.A. No. 2020-0050-SG (the "Complaint" or Compl.") and from the Court of Chancery's Opinion below. In this procedural posture, they are presumed to be true.

[4] App. to Op. Br. A86 [hereinafter, "A___"] (Compl. at ¶ 13).

[5] A87 (Compl. at ¶ 15). Hundreds of Brookfield's subsidiaries are incorporated in Delaware or otherwise organized as Delaware entities, including: Brookfield Properties, Inc. (which owns Christiana Mall in Newark, DE), Brookfield Properties Investor LLC, Brookfield Financial Partners, L.P., BOP Management Inc., BOP Properties Holdings LLC, Brookfield Mountain LLC, BOP North Cove Marina LLC, BOP Camarillo LLC, BOP (US) LLC, and BOP One North End LLC.

4

Defendant Below Brookfield BRP Holdings (Canada) Inc. ("BRP Holdings") is a Canadian corporation and an affiliate of Brookfield. BRP Holdings's sole purpose appears to be holding TerraForm stock. In June 2018, in connection with the Private Placement, BRP Holdings along with Orion Holdings, joined a Governance Agreement with TerraForm. The Governance Agreement establishes certain rights and obligations of TerraForm and Brookfield related to the Company's governance.

Appellants Brian Lawson, Harry Goldgut, Richard Legault, and Sachin Shah served as directors of TerraForm. Lawson is a Senior Managing Partner and the Chief Financial Officer ("CFO") of Brookfield. Goldgut is Vice Chair of Brookfield's Renewable Group and Brookfield's Infrastructure Group. Legault is Vice Chairman of Brookfield. Shah is a Managing Partner of Brookfield. He also serves as Chief Executive Officer ("CEO") of Brookfield Renewable Partners and BRP Holdings.

Appellant John Stinebaugh was TerraForm's CEO and was appointed as TerraForm's CEO by Brookfield. He is employed as a Managing Partner of Brookfield and receives no direct compensation from TerraForm for his service as CEO. Instead, he receives his compensation solely from Brookfield.

Appellees Martin Rosson ("Rosson") and City of Dearborn Police and Fire Revised Retirement System (Chapter 23) ("Dearborn," and collectively with Rosson, "Plaintiffs") were holders of TerraForm Class A common stock prior to a merger in July 2020.[6]

---

[6] A86 (Compl. at ¶ 13). TerraForm eliminated its previous share structure and thereafter had only a single class of stock, namely, the Class A, which was entitled to one vote per share.

5

## B. *Brookfield's Investment in Terraform*

In October 2017, Brookfield became Terraform's controlling stockholder, owning through Brookfield's affiliates 51 percent of Terraform's outstanding Class A common stock. Brookfield had the power to appoint Terraform's CEO, CFO, and General Counsel pursuant to a Master Services Agreement and governance agreement. Pursuant to TerraForm's certification of incorporation (the "Charter") and its majority holdings, Brookfield had the right to designate four of Terraform's seven directors and used that power to designate four members of Brookfield's senior management, namely, Defendants Lawson, Goldgut, Legault, and Shah, to Terraform's Board.

The Charter required that the TerraForm Board have a Conflicts Committee composed of the three non-Brookfield directors (the "Conflicts Committee").[7] The Conflicts Committee was responsible for reviewing and approving material transactions and matters in which a conflict may exist between TerraForm and Brookfield (and its affiliates). Additionally, TerraForm's Charter contained a supermajority voting provision, requiring an affirmative vote of at least two-thirds of the outstanding shares of common stock to amend certain Charter provisions.

## C. *Terraform Seeks to Finance a Buyout of Saeta Through an Equity Offering*

Around January 2018, Brookfield approached TerraForm regarding an opportunity to acquire for $1.2 billion Saeta Yield, S.A. ("Saeta"), a publicly-traded Spanish company that owned and operated wind and solar energy assets (the "Saeta Acquisition").

---

[7] A239 (Charter Art. VI, § 7). Since May 23, 2018, Mark McFarland, Christian S. Fong and Carol Burke comprised the Conflicts Committee.

6

TerraForm had the debt capacity and cash to fund most, if not all, of the Saeta Acquisition. Notwithstanding this debt capacity, Brookfield recognized the substantial upside associated with the Saeta Acquisition and steered TerraForm towards funding it with a backstopped equity offering that, according to Plaintiffs, allowed Brookfield to increase its ownership percentage of TerraForm at a discount to TerraForm's anticipated fair value.

On January 23, 2018, Brookfield and TerraForm informed the Conflicts Committee that, in addition to funding the Saeta Acquisition with debt, TerraForm would raise approximately $600 - $700 million of equity in the public markets. Brookfield indicated that in addition to participating up to its *pro rata* portion of the equity offering (*i.e.*, 51 percent), it was willing to backstop part of the equity offering. At this time, the Conflicts Committee decided not to retain an independent financial advisor and relied on advice from Barclays Capital, Inc. ("Barclays"), which was serving as TerraForm's financial advisor.

The Conflicts Committee met on January 26, 2018 and again on January 29. At the end of the meeting on the 29th, it determined that the proposed backstop was advisable and in TerraForm's best interests. The Conflicts Committee still had not engaged or consulted with a financial advisor. Instead, it relied on the members of TerraForm's management and Brookfield representatives for advice.

On February 6, 2018, without any assistance from an independent financial advisor, the Conflicts Committee approved a support agreement with Brookfield (the "Support Agreement"), pursuant to which Brookfield contracted to backstop up to 100 percent of a $400 million public equity offering (the "Backstop") if the offering price equaled

7

TerraForm's five-day volume weighted average price ending February 6, 2018, which was $10.66 per share.[8]

Brookfield's Backstop obligations were contingent on the successful commencement of a tender offer for Saeta (the "Tender Offer") under applicable Spanish law and on the prior effectiveness of the TerraForm registration statement, if required. TerraForm and Brookfield agreed that the pricing, size, and timing of the Equity offering, including the decision to use the Backstop, would be subject to prior review and approval of the Conflicts Committee, together with any other necessary approvals. It was also agreed in the Support Agreement that TerraForm and the Conflicts Committee would retain an independent financial advisor (meaning independent from Brookfield) to provide advice regarding the Equity Offering. However, the Conflicts Committee waited until late May 2018 to begin consulting with its own financial advisor, Greentech Capital Advisors Securities, LLC ("Greentech").

On February 7, 2018, TerraForm publicly disclosed its intention to acquire all outstanding shares of Saeta via the Tender Offer. TerraForm announced its expectation to fund the $1.2 billion acquisition with $800 million in available liquidity and the $400 million Equity Offering. On May 3, 2018 TerraForm commenced the Tender Offer, and on May 10, 2018, TerraForm filed its definitive proxy statement with the SEC seeking

---

[8] A83–84 (Compl. at ¶ 5); A114–15 (Compl. at ¶¶ 61–63). At the February 6, 2018 meeting, the Conflicts Committee noted that reducing the Equity Offering component of the Saeta Acquisition would be in TerraForm's best interests due, in part, to recent stock market volatility. A114–15 (Compl. n.13). The five-day period included the two lowest closing prices for TerraForm's stock in a nearly two-year period. A129–30 (Compl. at ¶ 103).

stockholder approval for the issuance of up to 61 million shares of Class A Common Stock in connection with the planned Equity Offering. TerraForm's stockholders approved the share issuance on May 23, 2018 at TerraForm's annual meeting.

    D.    *Brookfield Steers Terraform into the Private Placement, which Increases Brookfield's Economic Interest and Voting Power in Terraform*

Minutes after the stockholders approved the Share Issuance at the annual meeting, the full Board met to discuss the Equity Offering and backstop. Stinebaugh proposed to the Board that TerraForm raise $650 million, rather than $400 million, through the sale of equity because "the market expect[ed] a $650 million total equity offering and that the impact to the returns on the Saeta transaction would not be material."[9] Shah indicated that Brookfield would be prepared to increase the size of the backstop from $400 million back up to $650 million. By that point, the Tender Offer to acquire Saeta was scheduled to expire in only a few weeks, and TerraForm had little time to finalize its financing plan. Stinebaugh then proposed that if the Equity Offering presented too much market risk, the full amount be offered to Brookfield through a private placement at $10.66 per share. At the conclusion of the meeting, TerraForm's Board determined that the Conflicts Committee should consider Brookfield's proposal to increase the size of the Backstop to $650 million.

After the full Board meeting on May 23, 2018, the Conflicts Committee met to discuss the information that had just been presented. There was no discussion of the proposed private placement and only a discussion of the proposed increase to the equity offering (to $650 million) and commensurate increase in Brookfield's Backstop.

---

[9] A84 (Compl. at ¶ 7); A118 (Compl. at ¶ 73).

The Conflicts Committee's first meeting with its financial advisor, Greentech, occurred less than an hour after the May 23, 2018 Board meeting ended. Greentech's written presentation to the Conflicts Committee contemplated that Brookfield would backstop the full $650 million even though, according to meeting minutes, Brookfield first suggested the increased Backstop only a few hours earlier. The Conflicts Committee directed Greentech to coordinate with Barclays. It then met again the following day. At that meeting, Greentech reviewed with the Conflicts Committee the materials provided the previous day. These materials revealed that a $650 million equity offering would "significantly reduce returns" and accretion from the Saeta Acquisition relative to a $400 million offering. Nonetheless, Greentech advised the Conflicts Committee that it would be "difficult to predict the price at which the Equity Offering could be executed (and whether it could be executed at a price above [$10.66])."[10] Greentech also noted that a backstop covering the full amount of the Equity Offering "was very beneficial."[11] The Committee approved increasing the Backstop to $650 million and an amendment to the Support Agreement reflecting such increase. As with the previous day's meeting, there was no discussion of a private placement.

During the period after May 24, 2018, the Conflicts Committee received no advice concerning whether a private placement with TerraForm's controller was fair or superior to TerraForm's financing alternatives. Nearly all information provided to the Conflicts

---

[10] A122 (Compl. at ¶ 82).

[11] *Id*. (Compl. at ¶ 83).

10

Committee in the ensuing two-week period was geared toward convincing it to abandon the Equity Offering in favor of a $650 million private placement exclusively with Brookfield.

On June 4, 2018, after receiving a single slide deck from Greentech, and relying largely on the advice of Brookfield, TerraForm management, and Barclays, the Conflicts Committee approved exercising the $650 million Backstop in lieu of the Equity Offering. TerraForm management recommended doing away with the public offering aspect and instead simply selling the entire amount of the proposed offering directly to Brookfield. Despite the fact that the Conflicts Committee never received advice concerning a private placement with Brookfield, the Conflicts Committee accepted TerraForm management's recommendations and approved full exercise of the Backstop–that is, a private placement of $650 million of TerraForm stock with Brookfield at $10.66 per share.

On June 7, 2018, the Board authorized the sale of 60,975,609 shares of TerraForm common stock to Brookfield for $650 million using the $10.66 per share Backstop price, (*i.e.,* the "Private Placement"). The Private Placement proceeds were used to fund the Tender Offer along with $471 million of TerraForm's available liquidity. The Private Placement increased Brookfield's economic interest in and voting power over TerraForm from 51 percent to 65.3 percent.

With the $650 million received from Brookfield, along with the available liquidity, TerraForm acquired approximately 95 percent of Saeta's shares for an aggregate of $1.12 billion on June 12, 2018. Following the tender offer, TerraForm completed a squeeze-out under Spanish law for the remaining shares of Saeta that were not tendered.

11

TerraForm's stock price increased in the aftermath of the Saeta Acquisition and by June 25, 2018, TerraForm's stock was trading at $11.77 per share, 10.4 percent above the $10.66 per share Private Placement price, representing an unrealized profit of $68 million to Brookfield. On January 23, 2020, prior to the Complaint's filing, TerraForm's stock closed at $17.30 a share, representing $400 million in unrealized profit to Brookfield since the Private Placement.

In October 2019, TerraForm conducted a $250 million public offering for 14,907,573 shares of common stock at a price of $16.77 per share, a price 60 percent greater than Brookfield paid in the Private Placement. Concurrently, Brookfield entered into a second private placement purchasing 2,981,514 shares of common stock for $16.77 per share. Brookfield's equity percentage thereby decreased from 65.3 percent to 61.5 percent.

### E. Proceedings in the Court of Chancery

On September 19, 2019, Rosson filed a verified derivative and purported class action complaint against Brookfield, Orion, and BRP Holdings for breach of fiduciary duties.[12] On January 11, 2020, after Rosson filed his complaint and Dearborn demanded TerraForm's books and records, Brookfield-affiliate BR Partners proposed to acquire all of TerraForm's public shares.[13] Dearborn then filed a verified derivative and purported class action complaint against all Defendants for breach of fiduciary duty on January 27, 2020. The trial court consolidated the two actions and designated the Complaint filed by

---

[12] A38–77 (Compl.); A44 (Rosson Compl.).

[13] A329 (Brookfield Form F-1 Registration Statement Amendment dated Apr. 20, 2020).

12

Dearborn as the operative complaint in the consolidated action.[14] The Complaint alleges that Brookfield caused TerraForm to issue its stock in the Private Placement for inadequate value, diluting both the financial and voting interest of the minority stockholders. The Complaint also alleges that the Company was damaged as a result.[15]

Defendants moved to dismiss Plaintiffs' direct claims on the basis that they are entirely derivative. The Motion to Dismiss was argued on July 16, 2020.

On March 16, 2020, BR Partners and BR Corp agreed to acquire all TerraForm stock not held by Brookfield (*i.e.,* the "Merger"). On July 31, 2020, Brookfield affiliates acquired all outstanding TerraForm shares not already owned by Brookfield. In light of the Merger, the trial court granted an order dismissing the derivative counts of the Complaint. Following the Merger, TerraForm's public stockholders ceased to have any interest in TerraForm, and all of TerraForm's assets, liabilities, rights and causes of action became the property of TerraForm's acquirer.[16]

---

[14] A145–153 (Order of Consolidation and Appointment of Lead Plaintiffs and Co-Lead Counsel). The Complaint alleges three counts of breach of fiduciary duty. Count I is against Brookfield, Orion Holdings, and BRP Holdings as controlling stockholders. Count II is against Lawson, Goldgut, Legault, and Shah. Count III is against Stinebaugh. All counts were putatively brought both derivatively and directly.

[15] A140 (Compl. at ¶ 135) ("As a direct and proximate result of this misconduct, the Company and the Company's minority stockholders (through a reduction in economic value and voting power) have been damaged."); *see also* A142 (Compl. at ¶ 145) ("As a result of the misconduct described above, Defendants have caused loss and damages to the Company and its minority stockholders."); A149 (Compl. at ¶ 149) ("As a result of the misconduct described above, Stinebaugh has caused loss and damages to the Company and the Class for which Plaintiff seeks appropriate judicial relief.").

[16] 8 *Del. C.* § 259(a); *see also Lewis v. Anderson*, 477 A.2d 1040, 1044 (Del. 1984) (holding that the right to bring a derivative action passes via merger to the surviving corporation).

The Court of Chancery issued a thoughtful Opinion denying the Motion to Dismiss on October 30, 2020.[17] In its Opinion, the Court of Chancery rejected Plaintiffs' arguments that they have standing to pursue direct claims against the Defendants under *Tooley v. Donaldson, Lufkin & Jennette, Inc.* The Court of Chancery explained that under *Tooley*, dilution claims are classically derivative, *i.e.,* "the quintessence of a claim belonging to an entity: that fiduciaries, acting in a way that breaches their duties, have caused the entity to exchange assets at a loss."[18] The court explained further that the claims are still derivative, and that "[t]his rationale extends even where a controlling stockholder allegedly causes a corporate overpayment in stock and consequent dilution of the minority interest."[19] Thus, it held that "under *Tooley* alone, the Plaintiffs' overpayment claims neatly fall into the derivative category."[20]

Notwithstanding its conclusion that the Plaintiffs had failed to state direct claims under *Tooley*, the court nevertheless found that Plaintiffs had stated direct claims because the claims were predicated on facts similar to those presented in *Gentile v. Rossette*.[21] In fact, the Court of Chancery observed that "[t]he facts alleged in the Complaint fit *Gentile's* transactional paradigm to a T."[22] In *Gentile*, this Court determined that "the plaintiffs pled

---

[17] *In re TerraForm Power, Inc. S'holders Litig.*, 2020 WL 6375859 (Del. Ch. Oct. 30, 2020) (hereafter, "*Opinion*").

[18] *Opinion*, 2020 WL 6375859, at *9.

[19] *Id.*

[20] *Id.* at *11.

[21] 906 A.2d 91 (Del. 2006).

[22] *Opinion*, 2020 WL 6375859, at *12.

14

two independent harms arising from the transaction: (1) that the corporation was caused to overpay (in stock) for the debt forgiveness, and (2), the minority stockholders lost a significant portion of the cash value and voting power of the minority interest."[23] Regarding *Gentile*, the Court of Chancery observed that the current law is, as a matter of doctrine, unsatisfying.[24] But it concluded that it was "not free to decide cases in a way that deviates from binding Supreme Court precedent."[25] Accordingly, it held that

> [c]onsistent with *Gentile*, the Plaintiffs have made a sufficient pleading that Brookfield is TerraForm's controller, that Brookfield caused TerraForm to issue excessive shares of its stock in exchange for insufficient consideration, and that the exchange caused an increase in the percentage of the outstanding shares owned by Brookfield, and a corresponding decrease in the share percentage owned by the public (minority) stockholders. Such a pleading is sufficient, under controlling Supreme Court precedent, to withstand the Defendant's Motion to Dismiss the Plaintiffs' direct claims.[26]

Bound by this Court's decision in *Gentile*, the Court of Chancery determined that Plaintiffs had standing to assert direct claims and denied the Defendants' Motion to Dismiss.

Finally, the Court of Chancery held that Plaintiffs' "entrenchment" claims could not withstand dismissal because they did not satisfy the "reasonably conceivable" pleading standard.

On November 9, 2020, Defendants submitted an application to the trial court for certification of an interlocutory appeal of the Court of Chancery's decision denying their motion to dismiss. The trial court granted Defendants' application on November 24, 2020,

---

[23] *Gentile*, 906 A.2d at 99.

[24]*Opinion*, 2020 WL 6375859, at *15.

[25] *Id.* at *16.

[26] *Id.*

15

finding that the appeal could end the litigation and would serve considerations of justice "by clarifying an area of law that appears to be in a state of flux."[27]  It held that, "in light of case law questioning the continued vitality of *Gentile* at the trial court level, and in light of criticism at the Supreme Court level," the matter should be available for review by the Supreme Court at this Motion to Dismiss stage in the interests of justice.[28]

Defendants filed a timely Notice of Appeal on November 30, 2020.  This Court accepted the interlocutory appeal on December 14, 2020.

### F.     Contentions on Appeal and Cross Appeal

*First*, Appellants contend that the Plaintiffs' claims are exclusively derivative under *Tooley* and that the Supreme Court's decision in *Gentile* deviated from, and is doctrinally inconsistent with, the "simple analysis" set forth in *Tooley*.  *Second*, Appellants assert that, because *Gentile* contradicts and undermines long-standing case law, complicates real-world commercial transactions, and is superfluous given existing legal remedies, that *stare decisis* is inapplicable, and that *Gentile* should be overruled.

Appellees contend on cross-appeal that the Court of Chancery erred in holding that they had failed to plead reasonably conceivable direct claims for voting power dilution.

### II.     Standard of Review

The Delaware Supreme Court exercises *de novo* review when evaluating a trial court's decision to deny a motion to dismiss.[29]  Additionally, the Delaware Supreme Court

---

[27] A488–490 (Letter Op. at 2–4).

[28] A489 (Letter Op. at 3).

[29] *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 70 (Del. 1995).

16

reviews questions relating to standing under the *de novo* standard of review.[30]

### III. Analysis

#### A. Standing is a Threshold Question

In *El Paso*, we explained that "'[t]he concept of standing, in its procedural sense, refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or redress a grievance.'"[31] Thus, "'[a]s a preliminary matter, a party must have standing to sue in order to invoke the jurisdiction of a Delaware court.'"[32] Standing is therefore properly viewed as a threshold issue "to 'ensure that the litigation before the tribunal is a "case or controversy" that is appropriate for the exercise of the court's judicial powers.'"[33]

We explained further in *El Paso* that "[d]erivative standing is a 'creature of equity' that was created to enable a court of equity to exercise jurisdiction over corporate claims asserted by stockholders 'to prevent a complete failure of justice on behalf of the corporation.'"[34] A plaintiff may lose standing in a variety of ways during the progress of litigation. In corporate derivative litigation, for example, a plaintiff's standing is extinguished as a result of loss of plaintiff's status as a stockholder.[35] Once standing is

---

[30] *El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1256 (Del. 2016).

[31] *El Paso*, 152 A.3d at 1256 (citing *Schoon v. Smith*, 953 A.2d 196, 200 (Del. 2008)).

[32] *Id*. (quoting *Ala. By-Prod. Corp. v. Cede & Co.*, 657 A.2d 254, 264 (Del. 1995)).

[33] *Id*. (quoting *Dover Historical Soc'y. v. City of Dover Planning Comm'n.*, 838 A.3d 1103, 1110 (Del. 2003)).

[34] *Id*. (citing *Schoon*, 953 A.2d at 208).

[35] *Id*. (citing *Lewis*, 477 A.2d at 1049 (Del. 1984)). Frequently, the issue of standing arises in the context of the continuous ownership rule which is reflected in 8 *Del. C.* § 327 and in Court of Chancery Rule 23.1. In *Lewis*, this Court held that "[a] plaintiff who ceases to be a shareholder,

17

lost, "the court lacks the power to adjudicate the matter, and the action will be dismissed as moot unless an exception applies."[36]  Thus, the question of derivative standing is "'properly a threshold question that the [c]ourt may not avoid.'"[37]

> B.     *The Test for Derivative Standing:  Tooley and Gentile's Carve-Out*

> 1.  *First, the Tooley Test for Direct Versus Derivative Standing*

A derivative suit enables a stockholder to bring a suit on behalf of the corporation for harm done to the corporation.[38]  Because a derivative suit is brought on behalf of the corporation, any recovery must go to the corporation.  However, a stockholder who is directly injured retains the right to bring an individual action for injuries affecting his or her legal rights as a stockholder.[39]  "Such a claim is distinct from an injury caused to the corporation alone."[40]  In such individual suits, "the recovery or other relief flows directly to the stockholders, not to the corporation."[41]  Classification of a particular claim as

---

whether by reason of a merger or for any other reason, loses standing to continue a derivative suit." 477 A.2d at 1049.

[36] *El Paso*, 152 A.3d at 1256–57 (footnotes omitted).

[37] *Id*. at 1257; *see also Morris v. Spectra Energy P'rs (DE) GP, LP*, 246 A.3d 121, 129 (Del. 2021) ("The standing inquiry 'has assumed special significance in the area of corporate law.'").

[38] *Tooley*, 845 A.2d at 1036.

[39] An example of harm unique to the stockholders would be a board failing to disclose all material information when seeking stockholder action.  *See, e.g., In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 772 (Del. 2006) ("This Court has recognized, as did the Court of Chancery, that where it is claimed that a duty of disclosure violation impaired the stockholders' right to cast an informed vote, that claim is direct.").

[40] *Id*.

[41] *Id*.

18

derivative or direct can be difficult.[42]  Further, "[t]he decision whether a suit is direct or derivative may be outcome-determinative."[43]  Such is the case here as the central question is whether Plaintiffs have direct standing to pursue their claims or whether their claims are entirely derivative.  If the latter, then their claims were extinguished in the Merger, and they lack standing to pursue them.

In *Tooley*, this Court undertook to create a simple test of straightforward application to distinguish direct claims from derivative claims.  Under the *Tooley* test, the determination of whether a stockholder's claim is direct or derivative "must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[44]

In explaining its test further, the *Tooley* Court cited with approval the analysis set forth by Chancellor Chandler in *Agostino v. Hicks*,[45] and adopted his suggestion that part

---

[42] *See, e.g., Agostino v. Hicks*, 845 A.2d 1110, 1117–1118 (Del. Ch. 2004) (noting that "[t]he distinction between direct and derivative claims is frustratingly difficult to describe with precision," and that "[r]eference to Supreme Court opinions, while certainly instructive, does not conclusively resolve how this Court should draw the line between direct and derivative claims."). Other courts applying our law have experienced this difficulty as evidenced by our issuance of several opinions responding to other courts' request to answer certified questions involving distinguishing between a direct and derivative claim. *See, e.g., Citigroup Inc. v. AWH Investment P'ship*, 140 A.3d 1125 (Del. 2016) (*en banc*); *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175 (Del. 2015) (*en banc*); *Culverhouse v. Paulson & Co.*, 133 A.3d 195 (Del. 2016) (*en banc*).

[43] *Tooley*, 845 A.2d at 1036.  Derivative claims are also subject to higher pleading standards than direct claims.

[44] *Id*. at 1033 (emphasis in original).

[45] 845 A.2d 1110 (Del. Ch. 2004).

of the inquiry should be whether the stockholder has demonstrated that he or she has suffered an injury that is not dependent on an injury to the corporation:

> In the context of a claim for breach of fiduciary duty, the Chancellor articulated the inquiry as follows: "[l]ooking at the body of the complaint and considering the nature of the wrong alleged and the relief requested, has the plaintiff demonstrated that he or she can prevail without showing an injury to the corporation?" We believe that this approach is helpful in analyzing the first prong of the analysis: what person or entity has suffered the alleged harm? The second prong of the analysis should logically follow.[46]

In announcing this simplified test, this Court retreated from "our confusing jurisprudence on the direct/derivative dichotomy."[47] It concluded that the trial court's analysis had been "hindered . . . because it focused on the confusing concept of 'special injury' as the test for determining whether a claim is derivative or direct."[48] It then unequivocally abandoned the "special injury" concept in stating:

> In our view, the concept of "special injury" that appears in some Supreme Court and Court of Chancery cases is not helpful to a proper analytical

---

[46] *Tooley*, 845 A.2d at 1036.

[47] *Id*. at 1034.

[48] *Id*. at 1035. In describing the confusing jurisprudence, the *Tooley* Court observed that, "[t]his simple analysis is well embedded in our jurisprudence, but some cases have complicated it by injection of the amorphous and confusing concept of 'special injury.'" *Id*. After observing that the "special injury" concept had been set forth in *Elster v. American Airlines, Inc*., 100 A.2d 219 (Del. Ch. 1953)*,* it criticized the application of that concept in *Bokat v. Getty Oil*, 262 A.2d 246 (Del. 1970) and in *Lipton v. News Int'l Plc*., 514 A.2d 1075 (Del. 1986) as not setting forth the proper analysis. The *Tooley* Court then noted that "[t]he proper analysis has been and should remain that stated in *Grimes*; *Kramer* and *Parnes*." *Id*. at 1039 (citing *Grimes v. Donald*, 673 A.2d 1207 (Del. 1996); *Kramer v. Western Pac. Indus. Inc.*, 546 A.2d 348 (Del. 1988), and *Parnes v. Bally Enter. Corp.*, 722 A.2d 1243 (Del. 1999)). As explained herein, we note that *Gentile* added to the confusion by applying *In re Tri-Star Pictures, Inc. Litig*, 643 A.2d 319 (Del. 1993). In *Tri-Star*, where stockholder plaintiffs alleged that a controlling stockholder stood on both sides of a dilutive assets-for-stock transaction, this Court employed the special injury test and did not cite to *Kramer*. Instead, the Court in *Tri-Star* referred to the special injury test set forth in *Lipton*.

distinction between direct and derivative actions. We now disapprove the use of the concept of "special injury" as a tool in that analysis.[49]

It expressly disapproved "both the concept of 'special injury' and the concept that a claim is necessarily derivative if it affects all stockholders equally."[50] Instead, "the tests going forward should rest on those set forth in" its opinion.[51]

### 2. *The Gentile Carve-Out from the Tooley Test*

Two years after deciding *Tooley*, this Court decided *Gentile*. *Gentile* involved a controlling stockholder and transactions that resulted in an improper transfer of both economic value and voting power from the minority stockholders to the controlling stockholder. There, a corporation's CEO and controlling stockholder forgave a portion of the company's $3 million debt to him in exchange for additional equity. The applicable contractual conversion rate was $0.50 of debt per share, but the CEO and the company's board of directors (which included himself and one other person) agreed to $0.05 of debt per share. Without disclosing the underlying transaction, the board secured a stockholder vote authorizing the shares needed to issue the additional equity.

The share issuance increased the CEO's equity position from 61.19 percent to 93.49 percent. The minority stockholders suffered a corresponding decrease in their interest from 38.81 percent to 6.51 percent. When the CEO later negotiated a merger between the corporation and its only competitor, the CEO received a generous put agreement that was

---

[49] *Tooley*, 845 A.2d at 1035.

[50] *Id*. at 1039.

[51] *Id*.

21

not disclosed to the other stockholders.  The trial court dismissed the ensuing stockholders litigation after concluding that the claims were exclusively derivative and that the plaintiff stockholders' standing had been extinguished following the merger.

This Court reversed and allowed the plaintiffs to proceed with direct claims.  The Court reasoned that there were two independent aspects of the plaintiffs' claims, namely, the overpayment claim and the minority's significant loss of cash value and voting power. These claims constituted "a species of corporate overpayment claim" that was "both derivative and direct in character."[52]  Accordingly, this Court held that "[u]nlike the typical overpayment transaction,"[53] a dual-natured claim arises where:

> (1) a stockholder having a majority or effective control causes the corporation to issue "excessive" shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling shareholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders.[54]

The Court in *Gentile* clearly recognized that allowing direct standing to assert a corporate dilution/overpayment claim was a deviation from the norm:

> Normally, claims of corporate overpayment are treated as causing harm solely to the corporation and, thus, are regarded as derivative.  The reason (expressed in *Tooley* terms) is that the corporation is both the party that suffers the injury (a reduction in its assets or their value) as well as the party to whom the remedy (a restoration of the improperly reduced value) would flow.  In the typical corporate overpayment case, a claim against the corporation's fiduciaries for redress is regarded as exclusively derivative, irrespective of whether the currency or form of overpayment is cash or the corporation's stock.  Such claims are not normally regarded as direct,

---

[52] *Gentile*, 906 A.2d at 99.

[53] *Id*. at 100 n.21.

[54] *Id*. at 100.

because any dilution in value of the corporation's stock is merely the unavoidable result (from an accounting standpoint) of the reduction in the value of the entire corporate entity, of which each share of equity represents an equal fraction.  In the eyes of the law, such equal "injury" to the shares resulting from a corporate overpayment is not viewed as, or equated with, harm to specific shareholders individually.[55]

The *Gentile* panel addressed the tension with *Tooley* by acknowledging that "[a]lthough the corporation suffered harm (in the form of a diminution of its net worth), the minority shareholders also suffered a harm that was unique to them and independent of any injury to the corporation."[56]  Focusing on the identity of the alleged wrongdoer, the Court stated that, the harm to the minority plaintiffs "resulted from a breach of a fiduciary duty owed to them by the controlling shareholder, namely, not to cause the corporation to effect a transaction that would benefit the fiduciary at the expense of the minority shareholders."[57]  Thus, in *Gentile* the Court held that the value represented by the corporate overpayment is "an entitlement that may be claimed by the public shareholders directly and without regard to any claim the corporation may have."[58]

### 3. Plaintiffs Have Standing Under Gentile but Not Tooley

In this case, the Vice Chancellor determined that Plaintiffs' Complaint "does not state direct claims without *Gentile*, but that it does state direct claims under *Gentile's*

---

[55] *Id.* at 99.

[56] *Id.* at 103 (citing *Tooley*, 845 A.2d at 1039).

[57] *Id*.

[58] *Id*. at 100.

23

rationale."[59] In other words, that the Complaint does not state direct claims under "a classic *Tooley* analysis,"[60] but that it does under *Gentile*. We agree.

As noted above, to plead a direct claim under *Tooley*, a "stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation."[61] We do not think Plaintiffs can prevail without showing an injury to the corporation. The claim is derivative because they allege an overpayment (or over-issuance) of shares to the controlling stockholder constituting harm to the corporation for which it has a claim to compel the restoration of the value of the overpayment. Clearly, the gravamen of the Complaint is that the Private Placement was unfair and that TerraForm suffered harm.[62] Further, they seek rescissory damages on behalf of TerraForm.[63]

If the Private Placement was for inadequate consideration, the worth of the stockholder's interest is reduced to the extent TerraForm was harmed -- as the Vice Chancellor put it, "a classic derivative claim." The alleged economic dilution in the value of the corporation's stock is the unavoidable result of the reduction in the value of the entire corporate entity, of which each share of equity represents an equal fraction. Dilution is a typical result of a corporation's raising funds through the issuance of additional new shares.

---

[59] *Opinion*, 2020 WL 6375859, at *9.

[60] *Id.*

[61] *Tooley*, 845 A.2d at 1039.

[62] *See* A140 (Compl. at ¶ 135) (alleging damage to "the Company" and to its minority stockholders only "through a reduction in economic value and voting power").

[63] A82, A141 (Compl. at ¶¶ 1, 140).

24

As the Court in *Gentile* recognized, normally such equal "injury" to the shares resulting from a corporate overpayment is not equated to specific, individual harm to stockholders. Here, the economic and voting power dilution that allegedly harmed the stockholders flowed indirectly to them in proportion to, and via, their shares in TerraForm, and thus any remedy should flow to them the same way, derivatively via the corporation.[64]

That is why in *El Paso* we suggested that *Gentile* "can be read as undercutting the traditional rule that dilution claims are classically derivative."[65] We think that when a corporation exchanges equity for assets of a stockholder who is already a controlling stockholder for allegedly inadequate consideration, the dilution/overpayment claim is exclusively derivative. Carving out an exception to the *Tooley* test and allowing for a separate, direct claim in such circumstance presents both practical and doctrinal difficulties as we discuss herein. To the extent the corporation's issuance of equity does not result in a shift in control from a diversified group of public equity holders to a controlling interest, (a circumstance where our law, *e.g., Revlon*,[66] already provides for a direct claim), holding

---

[64] In such cases, the remedy could be cancelling the shares and allowing the corporation to sell them for fair value or requiring the acquirer to pay fair value for the shares.

[65] 152 A.3d at 1251.

[66] *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 182 (Del. 1986) (finding that once a corporate board decides to effectuate the sale of the company, its duty changes "from the preservation of [the company] as a corporate entity to the maximization of the company's value at a sale for the stockholders' benefit"). As we explained in *Paramount Communications, Inc. v. QVC Network Inc.*, "[i]n the absence of devices protecting the minority stockholders, stockholder votes are likely to become mere formalities where there is a majority stockholder . . . [t]he acquisition of majority status and the consequent privilege of exerting the powers of majority ownership come at a price," and that price "is usually a control premium which recognizes not only the value of a control block of shares, but also compensates the minority stockholders for their resulting loss of voting power." 637 A.2d 34, 42–43 (Del. 1994).

Plaintiffs' claims to be exclusively derivative under *Tooley* is logical and re-establishes a consistent rule that equity overpayment/dilution claims, absent more, are exclusively derivative.[67]   Because we agree with the Vice Chancellor that Plaintiffs' claims do fit precisely into the *Gentile* paradigm, we now explain why *Gentile* should be overruled.

### C.      *Gentile Should be Overruled*

#### 1.  *Gentile's Tension with Tooley*

Appellants persuasively argue that, "[g]iven the clear conflict between *Gentile* and *Tooley*, the confusion *Gentile* imposes on *Tooley's* straightforward and easy-to-apply analysis, and the policy reasons for removing the exception . . ., this Court should exercise its discretion to overrule *Gentile*.[68]   After careful consideration of the relevant doctrinal, practical, and policy considerations, we agree and address these points in turn.  We first focus on *Gentile's* analytical tension with *Tooley*.

In *Gentile*, this Court stated that its holding "fits comfortably within the analytical framework mandated by *Tooley*."[69]  Based upon that comment, the Vice Chancellor stated that, "to the extent that *Gentile* can be said to rely on *Tri-Star*, the *Gentile* decision itself

---

[67] *See, e.g., Oliver v. Bos. Univ.*, 2006 WL 1064169, at *17 (Del. Ch. Apr. 14, 2006) ("Under *Tooley*, the harm alleged by the Plaintiffs was suffered by the corporation because it was the corporation in the Plaintiffs' scenario that issued its stock too cheaply."); *Green v. Locate Plus Holdings Corp.*, 2009 WL 1478553, at *2 (Del. Ch. May 15, 2009) ("Classically, Delaware law has viewed as derivative claims by shareholders alleging that they have been wrongly diluted by a corporation's overpayment of shares."); *Feldman v. Cutaia*, 951 A.2d 727, 732–33 (Del. 2008).

[68] Op. Br. at 26.

[69] *Gentile*, 906 A.2d at 102.  We note that *Tooley* was decided by an *en banc* panel of five Justices. *Gentile* was decided by a panel of three Justices, all of whom were part of the *Tooley en banc* panel.

forecloses any argument that *Gentile*'s citation of *Tri-Star* renders *Gentile* irreconcilable with *Tooley*."[70] But our critical self-assessment of *Gentile*, coupled with subsequent decisions at the trial court level, lead us now to the conclusion that the "fit" is not so "comfortable."

Instead, we agree with Appellants that certain aspects of *Gentile* are in tension with *Tooley*.[71] One aspect is *Gentile*'s conclusion that the economic and voting dilution was an injury to stockholders *independent* of any injury to the corporation. A second is *Gentile's* reliance on *Tri-Star*, which itself was criticized in *Tooley*. A third is *Gentile's* focus on the alleged wrongdoer, here the controller, and the devising of a special rule or *Tooley* "carve-out" for cases involving controlling stockholders.

As to the first point, in *Tooley*, this Court stated that "[t]he stockholder's claimed direct injury must be *independent* of any alleged injury to the corporation."[72] In *Gentile*, this Court acknowledged that the corporation was injured also, but nevertheless, found the plaintiffs' claims to be *both* derivative and direct:

> Because the means used to achieve that result is an overpayment (or "over-issuance") of shares to the controlling stockholder, the corporation is harmed

---

[70] *Opinion*, 2020 WL 6375859, at *13.

[71] We intend no disrespect to any prior panel of this Court. Rather, we recognize that the law must evolve as a result trial and error, through the tests of time and practical application. The Court at the time perceived *Gentile* as being harmonious with the *Tooley* test. The parties in *Gentile* did not appear to have perceived the case as a departure either as they did not move for rehearing *en banc* as only an *en banc* panel may modify or overrule a prior decision of this Court. Supr. Ct. R. 4(f). Cases should not be overruled because the composition of the Court changes and members of the Court may have different views, and mere difference of opinion should not -- and does not today -- cause a departure from precedent. Rather, with the benefit of hindsight and the added perspective of fifteen years of development in Delaware corporate law which our predecessors did not enjoy, we find compelling reasons to revisit *Gentile*.

[72] *Tooley*, 845 A.2d at 1039 (emphasis added).

27

and has a claim to compel the restoration of the value of the overpayment. That claim, by definition, is derivative.[73]

It went on to find a "separate, and direct, claim arising out of that same transaction."[74] The direct claim was "an improper transfer–or expropriation–of economic value and voting power from the public shareholders to the majority or controlling stockholder."[75]

The gravamen of Plaintiffs' Complaint is that the Private Placement allegedly harmed the Company by issuing shares to Brookfield for an unfairly low price and harmed the stockholders indirectly through economic and voting power dilution proportional to their shareholdings. Thus, the harm to the stockholders was not *independent* of the harm to the Company, but rather flowed indirectly to them in proportion to, and via their shares in, TerraForm. We agree with the Vice Chancellor that under *Tooley*, this alleged corporate overpayment in stock and consequent dilution of minority interest falls "neatly" into *Tooley's* derivative category.

---

[73] *Gentile*, 906 A.2d at 100.

[74] *Id.*

[75] *Id.* This Court in *Gentile* chose not to use the word "dilution" and instead used "extraction or expropriation:"

> In *Tri-Star*, this Court articulated the harm to the minority in terms of a "dilution" of the economic value and voting power of the stock held by the minority. In this case, we adopt a more blunt characterization -- extraction or expropriation -- because that terminology describes more accurately the real-world impact of the transaction upon the shareholder value and voting power embedded in the (pre-transaction) minority interest, and the uniqueness of the resulting harm to the minority shareholders individually, than does a description framed in terms of "dilution."

906 A.2d at 102 n.26. But the presence of a controlling stockholder does not negate the fact that the minority stockholders were diluted in proportion to their stockholdings in TerraForm.

28

*Gentile's* second point of tension with *Tooley* is its reliance upon *Tri-Star*. In *Gentile*, the plaintiffs argued that their case was "functionally indistinguishable from, and thus [was] controlled by *Tri-Star*."[76] In *Gentile*, this Court summarized their argument:

> Their argument runs as follows: even if the SinglePoint shares had value, the debt conversion was a self-dealing corporate transaction with a significant stockholder, that increased the voting and economic value of that significant stockholder's interest in SinglePoint, at the expense and to the corresponding detriment of the minority shareholders. The plaintiffs claim that the Court of Chancery erred by reading into *Tri-Star* a requirement that for such a transaction to give rise to a direct claim, the loss of voting power must be 'material,' *i.e.,* that it must reduce the public stockholders' voting power from majority to minority status.[77]

This Court then "conclude[d] that the plaintiffs are correct and that *Tooley* and *Tri-Star*, properly applied, compel the conclusion that the debt conversion claim was both derivative and direct."[78] In fact, it held that "[t]his case is . . . functionally indistinguishable from *Tri-Star*, and *Tri-Star's* governing rule should control."[79]

Plaintiffs argue on appeal that "*Tooley* noted that *Tri-Star* addressed the special injury concept that was being discarded but did not discuss or overrule *Tri-Star's* result."[80] They argue further that *Gentile* did not specifically discuss the "special injury" test, and that its reference to *Tri-Star* "merely recognizes that the special injury analysis partially concerns the same issue as *Tooley's* first prong -- *i.e.,* whether stockholders were directly

---

[76] *Id.* at 101.

[77] *Id.* at 99.

[78] *Id.*

[79] *Id.* at 101.

[80] Ans. Br. at 27.

harmed."[81]  They also point out that *Gentile* cites to *Kramer* which *Tooley* had cited with approval.

Some historical perspective may be useful in explaining the confusion that *Tooley* sought to eliminate, and why there is support for the view that *Gentile* is doctrinally in tension with *Tooley*.  The phrase "special injury" was first used by the Court of Chancery in *Elster v. Am. Airlines, Inc.*[82]  There, the plaintiff asserted a direct claim for dilution, alleging that a stock issuance to senior management was for inadequate consideration.  The court rejected plaintiff's claim, in part, because

> [a]ny injury which plaintiff may receive by reason of the dilution of his stock would be equally applicable to all the stockholders of defendant, since plaintiff holds such a small amount of stock in proportion to the amount of stock outstanding that the control or management of defendant would not be affected by the granting of these options, and, further, since there is no averment that the pre-emptive rights of plaintiff as a stockholder are affected by their issuance.[83]

The Court of Chancery, in setting forth the "special injury" test, identified three categories of direct injury.  It also recognized that stockholders could be harmed *indirectly* as a result of harm to the corporation and that such claims would be derivative:

> There are cases . . . in which there is injury to the corporation and also special injury to the individual stockholder.  In such case a stockholder . . . may proceed on his claim for the protection of his individual rights rather than in the right of the corporation.  The action would then not constitute a derivative action . . .  Here the wrong of which plaintiff complains is not a wrong inflicted upon him alone or a wrong affecting any particular right which he is asserting,—such as his pre-emptive rights as a stockholder, rights involving control of the corporation, or a wrong affecting the stockholders

---

[81] *Id.*

[82] 100 A.2d 219, 222 (Del. Ch. 1953).

[83] *Id*. at 222.

and not the corporation,—*but is an indirect injury as a result of the wrong done to the corporation.*[84]

But later decisions in this class of cases omitted *Elster's* reference to "indirect injury" in describing derivative claims. In *Bokat v. Getty Oil Co.*,[85] a stockholder sought "money damages for improper management of [the corporation]."[86] Thus, the *Bokat* Court classified the claims as belonging to the corporation and not its stockholders. But it reached that result by reasoning that, "[w]hen an injury to corporate stock falls equally upon all stockholders, then an individual stockholder may not recover for the injury to his stock alone, but must seek recovery derivatively on behalf of the corporation."[87]

Similarly, in *Moran v. Household Int'l. Inc.*,[88] the Court of Chancery inquired whether the plaintiffs had suffered an "injury distinct from that suffered by other shareholders."[89] There the Court of Chancery held that the adoption of a shareholder rights plan was not subject to an individual challenge unless shareholders were actively engaged in a proxy fight that the rights plan would thwart. It reasoned that the claims were derivative, "[b]ecause the plaintiffs are not engaged in a proxy battle, they suffer no injury distinct from that suffered by other shareholders as a result of this alleged restraint on the

---

[84] *Id*. (emphasis added).

[85] 262 A.2d 246 (Del. 1970).

[86] *Id*. at 249.

[87] *Id*. (citing 13 Fletcher, *Corporations* (Perm. Ed.) § 5913).

[88] 490 A.2d 1059, 1069–70 (Del. Ch. 1985), *aff'd*, 500 A.2d 1346 (Del. 1985).

[89] *Id*. at 1069–70.

31

ability to gain control of [the company] through a proxy contest."[90]  *Moran* cited *Elster* but did not refer to the "special injury" concept.  Instead, *Moran* set forth the following test for ascertaining the nature of the claim:

> To set out an individual action, the plaintiff must allege either an injury which is separate and distinct from that suffered by other shareholders, or a wrong involving a contractual right of a shareholder, such as the right to vote, or to assert majority control, which exists independently of the corporation.[91]

This Court affirmed the decision but did not specifically address the Court of Chancery's holding that the claims were derivative.[92]

The following year, this Court addressed the direct/derivative distinction in *Lipton v. News Int'l, Plc.*[93]  In its analysis, *Lipton* compared the passages from both *Moran* and *Elster* quoted above.  But in doing so, *Lipton* failed to mention the third situation in *Elster* giving rise to "special injury," namely, when "a wrong affected the stockholders and not the corporation:"

> In comparing the two-pronged test of *Moran* with the definition of "special injury" in *Elster*, it appears that the term encompasses both prongs of the *Moran* test.  That is, a plaintiff alleges a special injury and may maintain an individual action if he complains of an injury distinct from that suffered by other shareholders or a wrong involving one of his contractual rights as a shareholder.  Moreover, while *Moran* serves as a useful guide, the case should not be construed as establishing the only test for determining whether a claim is derivative or individual in nature.  Rather, as was established in

---

[90] *Id.* at 1070–1071.  In addition, the Court found that, although the plaintiff corporation was the defendant corporation's largest stockholder (holding approximately five percent of the defendant corporation's stock), it did not suffer any unique harm merely by virtue of its holdings because it had no alleged intent to use its block position to gain control of the defendant corporation.

[91] *Id.* at 1070 (internal quotations and citations omitted).

[92] *Moran v. Household Int'l Inc.*, 500 A.2d 1346 (Del. 1985).

[93] 514 A.2d 1075 (Del. 1986).

*Elster*, we must look ultimately to whether the plaintiff has alleged "special" injury, in whatever form.[94]

In 1988, this Court again addressed the direct/derivative distinction in *Kramer v. Western Pacific Industries, Inc.*[95] Surprisingly, *Kramer* did not rely on *Lipton*, although it cited it. Nor did it refer to "special injury." There plaintiffs challenged certain corporate insiders' receipt of stock options and golden parachutes in a merger transaction. In determining that the claims amounted only to "waste" and were derivative, the Court articulated the direct/derivative test as:

> [T]o have standing to sue individually, rather than derivatively on behalf of the corporation, the plaintiff must allege more than an injury resulting from a wrong to the corporation. . . . "[T]o set out an individual action, the plaintiff must allege either 'an injury which is separate and distinct from that suffered by other shareholders,' or a wrong involving a contractual right of a shareholder . . . which exists independently of any right of the corporation." For a plaintiff to have standing to bring an individual action, he must be injured *directly* or *independently* of the corporation.[96]

In 1993, this Court next addressed the direct/derivative analysis in *Tri-Star*. There we relied on *Lipton* and the "special injury" test without ever citing to the more recent decision in *Kramer*. *Tri-Star* stated the "special injury" test as follows:

> It is well settled that the test used to distinguish between derivative and individual harm is whether the plaintiff suffered 'special injury.' A special injury is established where there was a wrong suffered by the plaintiff that

---

[94] *Id.* at 1078; *see also* Kurt M. Heyman & Patricia L. Enerio, *The Disappearing Distinction between Derivative and Direct Actions*, 4 DEL. L. REV. 155 (2001).

[95] 546 A.2d 348 (Del. 1988).

[96] *Id.* at 351 (quoting *Moran*, 490 A.2d at 1070 and citing *Bokat*, 262 A.2d at 249) (emphasis in original).

was not suffered by all the stockholders generally or where the wrong involves a contractual right of the stockholders, such as the right to vote.[97]

Like *Lipton*, *Tri-Star* omits *Elster's* third category of special injury "when the wrong affects the stockholders and not the corporation."

But then three years later, in *Grimes v. Donald*,[98] this Court, in distinguishing between direct and derivative claims, relied almost exclusively on *Kramer* and *Moran* but did not mention either *Lipton* or *Tri-Star*. Nor did it mention the "special injury" concept:

> "Although tests have been articulated many times, it is often difficult to distinguish between a derivative and an individual action." . . . The distinction depends upon "'the nature of the wrong alleged' and the relief, if any, which could result if plaintiff were to prevail." . . . To pursue a direct action, the stockholder-plaintiff "must allege more than an injury resulting from a wrong to the corporation." . . . The plaintiff must state a claim for "'an injury which is separate and distinct from that suffered by other shareholders,' . . . or a wrong involving a contractual right of a shareholder . . . which exists independently of any right of the corporation."[99]

Then came our decision in *Parnes v. Bally Entertainment Corp.*,[100] where the plaintiff alleged that the Chairman and CEO of Bally wrongfully required that corporate assets be transferred to him in order to obtain his consent in proceeding with a merger. This Court concluded that such allegations directly challenged the fairness of the process

---

[97] *Tri-Star*, 634 A.2d at 330 (finding that plaintiffs stated individual claims for cash-value and voting power dilution and separately, that the controlling stockholder's alleged breach of the duty of disclosure, if true, is a unique special harm to each uninformed stockholder for which the wrongdoer is answerable in damages.).

[98] 673 A.2d 1207 (Del. 1996).

[99] *Id.* at 1213 (citing *Kramer*, 546 A.3d at 352 and *Moran*, 490 A.2d at 1070).

[100] 722 A.2d 1243 (Del. 1999).

and the price in the merger.[101]  Citing only to *Kramer* and avoiding the term "special injury," it stated simply that "[a] derivative claim is one that is brought by a stockholder, on behalf of the corporation, to recover for harms done to the corporation."[102]  By contrast, "[s]tockholders may sue on their own behalf (and, in appropriate circumstances, as representatives of a class of stockholders) to seek relief for direct injuries that are independent of any injury to the corporation."[103]

In 2004, this Court in *Tooley* sought to bring clarity to this confusing area of the law by discarding the "special injury" test and announcing a simple test that would be easier to apply.  It is important to identify precisely which part of *Tri-Star's* analysis was discarded by *Tooley*.  The answer lies in the refocused *Tooley* test itself and in *Tooley's* statement that

> two confusing propositions have encumbered our caselaw governing the direct/derivative distinction.  The "special injury" concept, applied in cases such as *Lipton*, can be confusing in identifying the nature of the action.  The same is true of the proposition that stems from *Bokat* -- that an action cannot be direct if all stockholders are equally affected or unless the stockholder's injury is separate and distinct from that suffered by other stockholders.[104]

The problem with *Lipton*, according to *Tooley*, was that the trial court had found a "special injury" because the board's manipulation of certain transactions "worked an injury

---

[101] *Id*. at 1245.

[102] *Id*.

[103] *Id*. (citing *Kramer*, 546 A.3d at 352).  This Court further stated that, "[a] stockholder who directly attacks the fairness or validity of a merger alleges an injury to the stockholders, not the corporation, and may pursue such a claim even after the merger has been consummated."  *Id*.

[104] *Tooley*, 845 A.2d at 1038–39.

upon the plaintiff-stockholders unlike the injury suffered by other stockholders."[105]  That

was because the plaintiff-stockholder was actively seeking to gain control of the defendant

corporation.  According to *Tooley*, the court could have reached the same correct result by

simply concluding that the manipulation directly and individually harmed the stockholders,

without injuring the corporation.

The problem with this Court's decision in *Bokat*, according to *Tooley*, was different.

Though the *Tooley* Court agreed that the *Bokat* matter was derivative, it explained that

*Bokat*'s concept that a suit "must be maintained derivatively if the injury falls equally upon

all stockholders" was both "confusing" and "inaccurate."[106]  It was inaccurate because "a

direct, individual claim of stockholders that does not depend on harm to the corporation

can also fall on all stockholders equally, without the claim thereby becoming a derivative

claim."[107]  It was "confusing" because the "equal injury" concept appeared to be intended

to address the fact that an indirect stockholder injury flowing derivatively through the

---

[105] *Id*. at 1037.

[106] *Id*.

[107] *Tooley*, 845 A.2d at 1037.  The Court of Chancery recognized this weakness in the "special injury" rule in *In re Gaylord Container Corp. S'holder Litig.*, when it allowed a class of all non-defendant stockholders to pursue a direct claim against controlling shareholders who were also board members and who had taken entrenchment actions which included anti-takeover provisions ten days before a post-bankruptcy restructuring terminated their shares' super-voting privileges and ended their control of the shareholder vote.  747 A.2d 71, at 73.  Reviewing *Moran*, the Court of Chancery in *Gaylord* wondered why the special injury cases would classify the case as direct or derivative based on whether the entrenching board were also shareholders themselves.  *Id.* at 80. "The mere fact that such an injury is to the economic property rights of all the stockholders rather than to their voting rights does not make the injury suffered any less 'special' and non-corporate." *Id*.  It then cited to commentators who had criticized *Moran's* focus "on the similarity of treatment" as missing "the central point that fundamental shareholder rights (*e.g.,* voting and alienability) can be infringed by a variety of board actions that treat existing shareholders alike."  *Id*. at 81 (citing *2 Principles of Corporate Governance: Analysis & Recommendations* § 7.01 n.3 at 30 (1994)).

corporation diminishes each share of stock equally.[108]  But the relevant factor was not that all stockholders could equally assert the claim -- it was that the claim "does not arise out of any independent or direct harm to the stockholders, individually."[109]

The *Tooley* Court then noted that "[t]he proper analysis has been and should remain that stated in *Grimes*, *Kramer*, and *Parnes*.  That is, a court should look to the nature of the wrong and to whom the relief should go."[110]

Further, *Gentile*, by focusing on whether one group of stockholders (a controller) was impacted differently from another group (the public or minority holders), arguably relied on one aspect of *Tri-Star's* special injury concept, *i.e.,* focusing on whether a wrong suffered by plaintiff was not suffered by all stockholders generally.[111]  We note that, if this were the proper focus and requirement for finding a direct injury as opposed to whether a stockholder suffered an injury independent of any injury suffered by the corporation, then that would seem to preclude a class of all stockholders asserting a direct claim.  *Tooley's*

---

[108] *Tooley*, 845 A.2d at 1037.

[109] *Id*.

[110] *Id.* at 1039.

[111] *See Tri-Star*, 634 A.2d at 330 ("A special injury is established where there is a wrong suffered by plaintiff that was not suffered by all stockholders generally or when the wrong involves a contractual right of stockholders, such as the right to vote.").  But *Tri-Star* recognized two different types of direct injury to shareholder voting rights:

> "Voting power dilution is a harm distinct and separate from that suffered by the minority shareholders due to the alleged nondisclosures made by the defendants in their proxy materials.  The harm from voting power dilution goes to the impact of an individual stockholder's vote, the latter harm goes to a stockholder's right to cast an *informed* vote."

*Id.* at n.12 (emphasis in original).

first prong instead properly focuses on who suffered the alleged harm and requires that the stockholder demonstrate that he or she has suffered an injury that is not dependent on an injury to the corporation.

In sum, *Gentile's* statements that *Tri-Star* "created the analytical framework for this issue," that *Gentile* "was functionally indistinguishable from *Tri-Star*," and that it applied *Tri-Star* and *Tooley* in determining the debt conversion claim was both derivative and direct,[112] detracts from *Tooley's* stated goal of adding clarity to a difficult and important area of our law. Although *Gentile* does not expressly discuss the "special injury" test, it creates confusion by heavily relying on *Tri-Star's* analysis,[113] which in turn relies on *Lipton* and the "special injury test" that *Tooley* rejected. By expressly stating that it had "applied" *Tooley* and *Tri-Star*, *Gentile* blurred *Tooley*'s clear rejection of the "special injury" test.[114]

The third area of tension is *Gentile's* focus on the wrongdoer. *Gentile* is premised on the presence of a controlling stockholder that allegedly used its control to "expropriate" and extract value and voting power from the minority stockholders. Controlling stockholders owe fiduciary duties to the minority stockholders, but they also owe fiduciary duties to the corporation.[115] The focus on the alleged wrongdoer deviates from *Tooley's*

---

[112] *Gentile*, 906 A.2d at 99, 101.

[113] We note in this regard that *Gentile* states that "*Tri-Star's* governing rule should control." *Id.* at 101.

[114] *Tri-Star* also did not cite to *Kramer* which, by contrast, had been cited with approval in *Tooley*. *Gentile*, however, does cite *Kramer*, but for the proposition that equity dilution is normally a derivative harm, not a direct harm. *Gentile*, 906 A.2d at 99.

[115] *Carr v. New Enter. Assocs., Inc.*, 2018 WL 1472336, at * 22 (Del. Ch. 2018) ("A controlling stockholder owes fiduciary duties to the corporation and its minority stockholders, and it is

38

determination, which turns *solely* on two central inquiries of who suffered the harm and who would receive the benefit of any recovery. That shift has led to doctrinal confusion in our law. The presence of a controller, absent more, should not alter the fact that such equity overpayment/dilution claims are normally exclusively derivative because the *Tooley* test does not turn on the identity of the alleged wrongdoer.[116]

Because of this shift in focus, the Vice Chancellor aptly observed that "[p]ost-*Gentile*, Delaware courts have struggled to define the boundaries of dual-natured claims."[117] Understandably, cases decided soon after *Gentile* assumed that direct standing was only available in circumstances involving a controlling stockholder or, by implication, a functionally equivalent control group.[118]

Thereafter, however, courts construed *Gentile* more expansively to logically extend to non-controller issuances involving participating insiders. In *Carsanaro v. Bloodhound Tech, Inc.*,[119] for example, the Court of Chancery held that *Gentile* also applied to self-

---

'prohibited from *exercising corporate power* (either formally as directors or officers or informally through control over officers and directors) so as to advantage [itself] while disadvantaging the corporation.'") (citation omitted).

[116] *See, e.g., Agostino*, 845 A.2d at 1126 n.84 ("The identity of the culpable parties does not speak to whether the conduct of those parties injured the corporation, rather than its stockholders.").

[117] *Opinion*, 2020 WL 6375859, at *13 (citing *Sciabacucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at *7 (Del. Ch. July 26, 2018).

[118] *Feldman*, 956 A.2d at 657 (Del. Ch. 2007) ("Indeed, any other interpretation would swallow the general rule that equity dilution claims are solely derivative, and would cast great doubt on the continuing vitality of the *Tooley* framework."), *aff'd*, 951 A.2d 727 (Del. 2008). Under *Feldman*, a dual-natured claim arises only where "a controlling stockholder, with sufficient power to manipulate the corporate processes, engineers a dilutive transaction whereby that stockholder receives an exclusive benefit of increased equity ownership and voting power for inadequate consideration." *Id*. at 657.

[119] 65 A.3d 618 (Del. Ch. 2013).

interested stock issuances effectuated by a board lacking a disinterested and independent majority. The Court of Chancery reasoned that "the core insight of dual injury applies to non-controller issuances in which insiders participate."[120]

Similarly, in *In re Nine Sys. Corp. S'holders. Litig.*,[121] the Court of Chancery found direct standing with respect to a dilutive recapitalization transaction in which the directors and their affiliated funds participated. The court commented that "it makes little sense to hold a controlling stockholder to account to the minority for improper expropriation after a merger but to deny standing for stockholders to challenge a similar expropriation by a board of directors after a merger."[122] The court asked why Delaware law should hold controlling stockholders to a higher standard than the board of directors when, after all, the board has exclusive authority to manage the business and affairs of the corporation, which includes the power to issue stock.[123] We agree that there is no principled reason to allow dilution/overpayment claims to proceed directly against controllers when the law rightly refuses to permit such claims to proceed directly in non-controller dilution cases.

This expanded application of *Gentile* was subsequently curtailed by this Court's

---

[120] *Id*. at 658. The Court of Chancery stated further that "[t]he expropriation principle operates only when defendant fiduciaries (i) had the ability to use the levers of corporate control to benefit themselves and (ii) took advantage of the opportunity." *Id*. at 659.

[121] 2014 WL 4383127, at *26 (Del. Ch. Sept. 4, 2014), *aff'd sub nom. Fuchs v. Wren Holdgs., LLC*, 129 A.3d 882 (Del. 2015) (TABLE).

[122] *Id.* at *28.

[123] *Id*.

opinion reversing the Court of Chancery in *El Paso*.[124]  The challenged transaction in *El Paso* did not fall squarely under the *Gentile* paradigm as the entity involved was a limited partnership and the alleged harm involved economic dilution where the limited partner conceded that he had proved only expropriation of economic value, and not any dilution of voting rights.  Understandably, the defendants in *El Paso* did not argue on appeal that *Gentile* should be overruled.  Thus, this Court was not asked -- and did not reconsider -- *Gentile* at that time.  However, in *El Paso* we expressly "decline[d] the invitation to further expand the universe of claims that can be asserted 'dually' to hold here that the extraction of solely economic value from the minority by a controlling stockholder constitutes direct injury."[125]  Thus, we made clear that *Gentile* should be read narrowly because any other interpretation would swallow the general rule that equity dilution claims are solely derivative and cast doubt on the *Tooley* framework.[126]

---

[124] *See, e.g., Carr*, 2018 WL 1472336, at *9 ("to invoke the dual dynamic recognized in *Gentile*, a controlling stockholder must exist *before* the challenged transaction.") (emphasis in original); *Cirillo Family Trust v. Moezinia*, 2018 WL 3388398, *16 (Del. Ch. 2018) ("the *Gentile* paradigm only applies when a stockholder *already possessing majority or effective control* causes the corporation to issue more shares to it for inadequate consideration.") (emphasis in original).

[125] 152 A.3d at 1264.

[126] *Id.*; *see also W&M Helenthal Holdg. LLC v. Schmitt*, C.A. No. 2018-0505-AB (Del. Ch. June 3, 2019) (TRANSCRIPT) at 51:11–115 ("In its 2016 *El Paso* decision, our Supreme Court made clear that the *Gentile* doctrine is to be construed narrowly and that the sort of dual claims described in that case only apply in the unique circumstances of that case."); *Sciabacucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at * 10 (Del. Ch. Jul. 26, 2018) ("*El Paso* thus implicitly rejected the reasoning of decisions such as *Carsanaro* and *Nine Systems*, which had extended *Gentile* to any dilutive issuance approved by a conflicted board."); *In re: Zohar III, Corp.*, --- B.R. ----, 2021 WL 2495146, at *39 (Bankr. D. Del. June 18, 2021) ("While the continued application and viability of the holdings in *Gentile* have been questioned, they have not been overruled. Regardless, they should be applied cautiously and narrowly.").

The Court of Chancery in *Sciabacucchi* observed our guidance that "the reasoning of *El Paso*, applied here, means that *Gentile* must be limited to its facts, which involved a dilutive stock issuance to a controlling stockholder."[127]  However, it noted that limiting *Gentile* to controller situations rather than expanding it to non-controller dilution cases, or overruling it entirely is, as a matter of doctrine, unsatisfying, because there is no reason to permit direct dilution claims against controllers while prohibiting direct claims in other contexts.[128]

Chief Justice Strine's concurrence in *El Paso* agreed that the facts presented did "not require us to consider *Gentile's* ongoing viability in the corporate law context," and that it was "[s]ufficient for today" that "we refuse to extend *Gentile* further, to a situation where a limited partnership was already firmly under the control of a general partner and where the transaction under attack had no effect whatsoever on limited partner voting rights."[129]  But he more directly questioned *Gentile's* continued viability as sound law, writing that *Gentile* "is a confusing decision, which muddies the clarity of our law in an

---

[127] *Sciabacucchi*, 2018 WL 3599997, at *10.  In *Reith v. Lichtenstein*, 2019 WL 2714065 (Del. Ch. June 28, 2019), the Court of Chancery determined that even an issuance of preferred stock to a controller for allegedly unfair consideration which resulted in a dilution of the minority stockholders' voting power, was derivative because stockholders retained the same percentage of the Company's shares of common stock after the Preferred Stock was issued as they had before. *See also Klein v. H.I.G. Capital, L.L.C.*, 2018 WL 6719717, at *7 (Del. Ch. Dec. 19, 2018) (noting "this court has exercised caution in applying the *Gentile* framework"); *Almond v. Glenhill Advisors LLC*, 2018 WL 3954733, at *24 (Del. Ch. Aug. 17, 2018) (the Supreme Court in *El Paso* "recently construed the [*Gentile*] doctrine narrowly" and "[i]n the wake of *El Paso*, this court has exercised caution in applying the *Gentile* framework").  We agree with Appellants that the different treatment of common and preferred stock in these cases makes little sense.

[128] *Id*. at *10, n.147

[129] *El Paso*, 152 A.3d at 1266 (Strine, C.J., concurring).

important context,"[130] and that it "cannot be reconciled with the strong weight of our precedent."[131]

It was not until this case that the issue of *Gentile's* continued viability was squarely presented to this Court.[132]  The Vice Chancellor appropriately observed that changing settled law by the Supreme Court requires reasoned analysis by this Court.  The difficulty courts have had in applying *Gentile* in a logically consistent way, along with *Gentile's* erosion of *Tooley's* simple analysis convinces us that *Gentile* should be overruled.

### 2. The Gentile "Carve-Out" is Superfluous

Aside from the doctrinal difficulties discussed above, we see no practical need for the "*Gentile* carve-out."  Other legal theories, *e.g., Revlon*, provide a basis for a direct claim for stockholders to address fiduciary duty violations in a change of control context.[133]  And as we observed in *El Paso*, "equity holders confronted by a merger in which derivative claims will pass to the buyer have the right to challenge the merger itself as a breach of the

---

[130] *Id.* at 1265–66.

[131] *Id*. at 1266.

[132] In *Sheldon v. Pinto Technology Ventures, L.P.*, for example, this Court did not address the continued vitality of *Gentile* because the sole issue presented was whether the plaintiff had adequately alleged the existence of a control group.  220 A.3d 245, 250 n.15 (Del. 2019).

[133] *El Paso*, 152 A.3d at 1266 (Strine, C.J., concurring) (noting that even in a change of control situation, "there is no gap in our law for *Gentile* to fill" since "*Revlon* already accords a direct claim to stockholders when a transaction shifts control of a company for a diversified investor base to a single controlling stockholder.").

43

duties they are owed."[134]  Such stockholders might claim that the seller's board failed to obtain sufficient value for the derivative claims.[135]

In addition, *Gentile* creates the potential practical problem of allowing two separate claimants to pursue the same recovery.[136]  The double recovery rule prohibits a plaintiff from recovering twice for the same injury from the same tortfeasor.[137]  In a corporate-overpayment-to-a-controlling shareholder claim, the amount of the overpayment deprives the corporation of assets to which minority shareholders have only a *pro rata* claim as residual claimants on the corporation's assets.  If the corporation recovers the overpaid funds, then the minority shareholders are beneficiaries of that recovery on that same *pro rata* basis.

---

[134] *El Paso*, 152 A.3d at 1252 (citing *Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1245 (Del. 1999) ("In order to state a direct claim with respect to a merger, a stockholder must challenge the validity of the merger itself, usually by charging the directors with breaches of fiduciary duty resulting in unfair dealing and/or unfair price.") (additional citations omitted).

[135] *See, e.g., Morris*, 246 A.3d at 132 ("After *Parnes*, 'to state a direct claim with respect to a merger, a stockholder must challenge the validity of the merger itself, usually by charging the directors with breaches of fiduciary duty resulting in unfair dealing and/or unfair price.'"); *id*. at 136 ("When the court is faced with a post-merger claim challenging the fairness of a merger based on the defendant's failure to secure value for derivative claims, we think the *Primedia* framework provides a reasonable basis to conduct a pleadings-based analysis to evaluate standing on a motion to dismiss.").

[136] We note that following the acquisition in *Gentile* (when the corporation was acquired by a third party and plaintiffs lost derivative standing), the acquiring company was liquidated and the stockholders of the acquired company were left as the only parties who could recover for a dilution claim.

[137] As this Court observed in *J.P. Morgan Chase & Co. S'holder Litig.*, "if the plaintiffs' damages theory is valid, the directors of an acquiring corporation would be liable to pay both the corporation and its shareholders the same compensatory damages for the same injury.  That simply cannot be." 906 A.2d at 773.

As Appellees concede, the double recovery rule does not permit both the direct and derivative claimants to recover for that single injury. Rather, they propose that the Court of Chancery devise a mechanism to "proportion" the recovery for the overpaid funds between the plaintiffs if both derivative and direct shareholders claim it.[138] Permitting such "dual" claims unnecessarily complicates fashioning a remedy for such claims. *Tooley* appropriately sought to simplify the law, not complicate it.

For the foregoing reasons, like the Court of Chancery, we think that the corporation overpayment/dilution *Gentile* claims, like those present here, are exclusively derivative under *Tooley* and that *Gentile*, for all of the reasons identified above, should be overruled. We now explain why *stare decisis* does not compel our adherence to *Gentile*.

### 3. *Stare Decisis Presents No Obstacle Here*

Plaintiffs argue that "*stare decisis*" compels this Court to uphold *Gentile*. No doubt, the development of and adherence to precedent is an essential feature of common law

---

[138]    COUNSEL: I think I was perhaps unclear then. I don't think there would be a double recovery, I think that in the end, there would only be one recovery and the court may have to determine as it would on any case, whether its direct and derivative claims permitted, how to proportion the damages. I think one solution might be to really allow the direct claim to go forward because ultimately those shareholders can receive the full remedy. But I don't at all think if the shares were underpriced by $3, that the corporation would get a $3 damages award and the shareholders would also get a $3 damages award, plus something else for derivative, for voting dilution damages, because then the shareholders would be double recovering. I don't know if that was a satisfactory answer, but I don't think there would be a double recovery.

Oral Argument at 23:00–25:44, https://livestream.com/delawaresupremecourt/events/9697327/videos/222905751.

systems,[139] and as such, precedent should not be lightly cast aside. The United States Supreme Court has explained that "*[s]tare decisis* 'promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.'"[140] That principle, embodied in the Latin term, "*stare decisis*,"[141] is an important feature of Delaware law and of judicial restraint. As this Court stated in *Seinfeld v. Verizon Comm'n, Inc.*, "[u]nder the doctrine of *stare decisis*, settled law is overruled only 'for urgent reasons and upon clear manifestation of error.'"[142]

When re-examining a question of law in a prior case, the essential danger is that parties have acted in reliance on the answer that this Court previously gave.[143] There is no hard and fast rule for when a decision is or is not immutable, because the nature of reliance

---

[139] *See* 1 Blackstone, Commentaries, *68–70 (conceiving of the common law as having its "maxims" known and "their validity determined" by "the judges in the several courts of justice," and that they are subject to "an established rule to abide by former precedents."); *see also Patterson v. McClean Credit Union*, 491 U.S. 164, 172 (1989) (observing that "*stare decisis* is a basic self-governing principle within the Judicial Branch, which is entrusted with the sensitive and difficult task of fashioning and preserving a jurisprudential system that is not based upon 'arbitrary discretion.'") (quoting the Federalist, No. 78, p. 490 (H. Lodge ed. 1888) (A. Hamilton)).

[140] *Gamble v. United States*, 139 S.Ct. 1960, 1969 (2019) (citation omitted).

[141] Literally "to stand by things decided." *Stare Decisis*, Black's Law Dictionary (11th ed. 2019).

[142] 909 A.2d 117, 124 (Del. 2006) (citing *Oscar George, Inc. v. Potts*, 115 A.2d 479, 481 (Del. 1955)). We have quoted that language verbatim on many occasions. *See*, *e.g., Shuba v. United Servs. Auto. Ass'n*, 77 A.3d 945, 949 (Del. 2013); *White v. Liberty Ins. Corp.*, 975 A.2d 786, 790–91 (Del. 2009); *Account v. Hilton Hotels Corp.*, 780 A.2d 245, 248 (Del. 2001).

[143] *See State v. Barnes*, 116 A.3d 883, 891 (Del. 2015) ("The doctrine of *stare decisis* exists to protect the settled expectations of citizens because, 'elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly.'") (alteration omitted) (quoting *Landsgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994)).

interests at play and the importance of improving doctrinal law are highly context-specific inquiries. Thus, the formulation we gave in *Seinfeld*, (quoting *Oscar George v. Potts*) though longstanding, is necessarily vague.

Nevertheless, decisions by Delaware and federal courts offer some guideposts by which to measure and weigh these reliance interests. One consideration is the nature of any reliance interests in the decision. Reliance interests flow from a number of sources.[144] Because parties have a right to have confidence that long-established rules will be retained, the "antiquity" of the precedent is accorded importance,[145] with due consideration for whether the challenged precedent was itself a departure.[146] The area of law the precedent addresses is likewise a consideration, since some subjects are more apt to induce reliance than others.[147]

---

[144] For example, the General Assembly, in its lawmaking capacity, necessarily relies upon this Court's pronouncements of what the law already is. Thus, "prior statute-interpreting rulings gain approving harmony from ensuing legislative silence." *See Nationwide Prop & Cas. Ins. Co. v. Irizarry*, 2020 WL 525667, at *4 (Del. Super. Jan. 31, 2020) ("Any concerted judicial misconstruction of a statute is subject to corrective tuning by the legislature, and thus prior statute-interpreting rulings gain approving harmony from ensuing legislative silence."), *aff'd,* 238 A.3d 191, 2020 WL 5031953 (Del. Aug. 25, 2020) (affirming the Superior Court on the basis of its opinion).

[145] *Gamble*, 139 S.Ct. at 1969 ("the strength of the case for adhering to such decisions grows in proportion to their 'antiquity'") (quoting *Montejo v. Louisiana*, 556 U.S. 778, 792 (2009)).

[146] *See Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 231 (1995) (if the precedent under consideration itself departed from the Court's jurisprudence, returning to the "intrinsically sounder" doctrine established in prior cases may "better serv[e] the values of *stare decisis* than would following the more recently decided cases inconsistent with the decisions that came before it").

[147] *See Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446, 457 (2015) ("Considerations favoring *stare decisis* are at their acme" in "cases involving property and contract rights" because "parties are especially likely to rely on such precedents when ordering their affairs."). In criminal matters, reliance interests are so strong that "under the doctrine of *stare decisis*, we must take seriously the

Clarity and administrability also relate to reliance interests, since reliance can only be created by a ruling which is amenable to consistent, stable, and thus predictable application.[148] Thus, a "traditional justification for overruling a prior case is that a precedent may be a positive detriment to coherence and consistency in the law, either because of inherent confusion created by an unworkable decision, or because the decision poses a direct obstacle to the realization of important objectives embodied in other laws."[149]

Bounded up with reliance interests are institutional considerations of the Court. Precedent should not be overturned by narrow majorities[150] and very recent precedent should not lightly be overturned when the only change is the composition of the court,[151] because society must be able to "presume that bedrock principles are founded in the law

---

longstanding interpretation of a statute held by our Superior Court, especially when it has been relied upon by the key actors in our criminal justice system." *Barnes*, 116 A.3d at 890–91.

[148] *See Itel Containers Int'l Corp. v. Huddleston*, 507 U.S. 60, 79–80 (1993) (Scalia, J., concurring) ("Like almost all their predecessors, these latest tests are so uncertain in their application (and in their anticipated life span) that they can hardly be said to foster stability or to engender reliance deserving of *stare decisis* protection.").

[149] *Patterson*, 491 U.S. at 173; *see also Urdan v. WR Cap. P'rs, LLC*, 244 A.3d 668, 678 (Del. 2020) (overturning, in part, *Schultz v. Ginsburg*, 965 A.2d 661 (Del. 2009) which has "caused some confusion in later cases"); *Brinkerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242, 252 (Del. 2017) (reversing one of this Court's prior rulings because it had departed from a common definition of bad faith used elsewhere in Delaware entity law and resulted in "confusing precedent").

[150] Supreme Court Rule 4(d) likewise informs this view, requiring a panel of this Court to seek rehearing *en banc* if a decision has a "reasonable likelihood" to modify or overrule a prior decision, even if the panel is unanimous.

[151] *See June Med. Servs. L. L. C. v. Russo*, 140 S.Ct. 2103, 2134 (2020) ("I joined the dissent in *Whole Women's Health* [*v. Hellerstedt*, 136 S.Ct. 2292 (2016)] and continue to believe that the case was wrongly decided," but concurring in the same outcome four years later because "[t]he legal doctrine of *stare decisis* requires us, absent special circumstances, to treat like cases alike.") (Roberts, C.J., concurring in the judgment). *But see id*. at 2151 ("[w]hen our prior decisions clearly conflict with the text of the Constitution we are required to 'privilege [the] text over our own precedents.'") (Thomas, J., dissenting.).

rather than in the proclivities of individuals."[152] "Overruling precedent is never a small matter."[153] Mere disagreement with the reasoning and outcome of a prior case, even *strong* disagreement, cannot be adequate justification for departing from precedent or *stare decisis* would have no meaning.[154]

This Court decided *Gentile* fifteen years ago. This is old enough, we think, that we can properly say that the practical and analytical difficulties courts have encountered in applying it reflect fundamental unworkability and not growing pains, but not so old as to carry the weight of "antiquity." Moreover, that gap in time has given us the perspective to see that *Gentile* is more of a departure from the then-recent *Tooley* than the continuation we perceived it to be at the time.[155] Any reliance is further muted by *El Paso*, from which parties could rightly anticipate that *Gentile*'s continued viability was in doubt. Finally, in overturning it today we speak unanimously, with the concomitant aid to certainty that provides. Having given all due consideration to the weight of precedent, the circumstances persuade us that we should overrule the *Gentile* exception to our *Tooley* test for derivative and direct standing. Accordingly, *Gentile* should be, and hereby is, overruled.

---

[152] *Vasquez v. Hillery*, 474 U.S. 254, 265–66 (1986).

[153] *See Kimble*, 576 U.S. at 455.

[154] *Id*. ("Respecting *stare decisis* means sticking to some wrong decisions.").

[155] *See, e.g., Adarand Constructors, Inc.*, 515 U.S. at 234 (noting that "reliance on a case that has recently departed from precedent is likely to be minimal.").

*D. Appellees Cross-Appeal Contention that They Have Direct Standing Regardless of Gentile is Meritless*

Appellees also separately argue on cross-appeal that they have direct standing to proceed without *Gentile* because the transaction consolidated Brookfield's control of the corporate levers of power, and so the Board violated its fiduciary duties by approving the transaction without compensating the minority shareholders for the further diminution of their voting power. Appellees argue that because entrenchment works a disenfranchisement felt by the minority stockholders as voters, they have direct standing apart from *Gentile*.

At the outset, it is not clear that the cross-appeal is procedurally proper. Unlike Brookfield, Appellees did not present their application for interlocutory appeal to the Court of Chancery,[156] and Plaintiffs opposed the defendants' application. Our rules instruct us not to take interlocutory cross-appeals that fail to adhere to procedural requirements.[157] But for the sake of efficiency, we address the issue presented.

Appellees' direct disenfranchisement argument is twofold. First, Plaintiffs contend that the Private Placement allowed Brookfield to expand their majority voting control enough that a subsequent sale would not eliminate their majority status (the "Entrenchment

---

[156] *See* Del. Supr. Ct. R. 42(c) ("An application for certification of an interlocutory appeal shall be made in the first instance to the trial court.").

[157] *See* Del. Supr. Ct. R. 42(d)(ii) ("No interlocutory order shall be reviewed by this Court unless the appeal therefrom has been accepted by this Court in accordance with the following procedure: . . . (ii) *Form of Filing*. The notice of appeal **and any cross-appeal** shall comply with this rule, Rules 6 and 7 of this Court and with such version of Official Form M as shall be applicable to the situation") (emphasis added) (italics in original).

Claim").[158]   Second, the Private Placement brought Brookfield near to *super*majority voting control, a threshold that, if they crossed it, would permit them to unilaterally alter certain provisions of the corporate charter without Appellees' consent (the "Supermajority Claim").[159]  Appellees emphasize that theirs was a *substantial* loss of voting power.[160]

The Entrenchment Claim fails because Plaintiffs fail to allege any facts supporting a reasonably conceivable inference that Brookfield, absent the Private Placement, would have permitted a dilution of their equity stake sufficient to relinquish their majority control. Brookfield's stake in TerraForm declined slightly in the 2019 equity issuance because, concurrently with the $250 million October 2019 public offering of close to fifteen million shares at $16.77 per share, Brookfield made a further investment in a private placement (of close to three million shares) at the same price.[161]  Plaintiffs' theory is that Brookfield entrenched itself in 2018 in anticipation of failing to purchase sufficient stock to maintain control in 2019.  In other words, had it not increased its majority interest in 2018 from 51 percent to 65.3 percent, and if it had acted in that hypothetical situation as it did in fact— not participating *pro rata* in the 2019 offering—Brookfield would have allowed TerraForm to issue stock and decrease its holdings below a majority level without compensation.

---

[158] A131–32 (Compl. at ¶¶ 105–06).

[159] A135 (Compl. at ¶¶ 113–14).

[160] Ans. Br. at 44.  Appellees also argue in their Reply Brief on Cross Appeal that "[b]ecause entire fairness review applies, the trial court erred in conducting an entrenchment analysis."  Appellees' Reply Br. on Cross Appeal at 4.  But this was not a theory that was fairly presented below.  *See* https://livestream.com/delawaresupremecourt/events/9697327/videos/222905751,   40:46–42:06 (Oral Argument held June 30, 2021).

[161] A131–32 (Compl. at ¶¶ 105–06, nn.18–19).

We agree that it is not reasonably conceivable that these allegations state a claim. As the Vice Chancellor points out, Plaintiffs fail to allege that anyone knew in June 2018 that TerraForm would conduct an offering in October 2019. Moreover, it would have to be reasonably conceivable that even had the Private Placement not occurred, Brookfield would not have participated on a *pro rata* basis in the 2019 offering, thereby choosing to forego its majority stake. Because a control premium has value, we agree it is not reasonably conceivable that Brookfield would have declined to participate in the 2019 offering if that would translate into Brookfield forfeiting majority control for no premium.

Nor does the Supermajority Claim hit the mark, again for the reasons the Court of Chancery explained. To overcome the supermajority threshold, Brookfield needed to expand its equity stake to exceed two-thirds of the Company's voting shares. The Private Placement raised Brookfield's share to 65.3 percent only. As the Vice Chancellor found, Brookfield never achieved the level of control necessary to unilaterally remove the supermajority voting rights, and Brookfield never attempted to abrogate the rights through the 2019 offering. For the reasons stated by the Vice Chancellor, we agree that Plaintiffs' entrenchment claims fail.

*IV. Conclusion*

For the foregoing reasons, this Court overrules *Gentile* and **REVERSES** the Court of Chancery's denial of Defendant's Motion to Dismiss for lack of standing.